Charles H. McCutcheon, Appellant, *v.* The Terminal
Station Commission of the City of Buffalo et al.,
Respondents, and the City of Buffalo, Appellant.

Buffalo (city of) — construction of statute creating a railway
terminal station commission for city of Buffalo (L. 1911, ch. 842)
— powers and duties of commission — validity of acts of commis-
sion — objections to work done and contracts made by commis-
sion examined, and held, untenable.

1. Chapter 842 of the Laws of 1911 created a commission and con-
ferred upon it broad powers on behalf of the city of Buffalo, not
only to secure the elimination of crossings of streets at grade by
railroad tracks, but also to permit and require the railroad com-
panies within the city limits to furnish better terminal facilities for
the travel and shipment of passengers and freight respectively.
This commission, in behalf of the city, has made a contract with
two railroad companies for that purpose, which contract involves,
among other things, the elimination of many grade crossings.    On
examination of the terms of the contract, the facts proven with
reference thereto and the objections made to its validity and opera-
tion, *held,* that in this action, brought by a taxpayer to restrain the
execution of the contract, it is neither the duty nor the right of
this court to substitute its judgment for that of the commission in
weighing and balancing against each other mere advantages and
disadvantages accruing to the city from the contract, and that
the unanimous affirmance by the Appellate Division concludes this
court as to the findings of fact.

2. On examination of the contract and the facts and law with
reference to the closing of Front street, *held,* that there is no ade-
quate basis for the proposition urged by appellants that the action
of the commission is not justified by any fair reason, and results in
such disadvantages to the city of Buffalo that it bears upon its face
evidence of fraud, corruption and lack of good faith which is con-
clusive upon this court, and that this is the test by which upon this
appeal must be measured the right of plaintiff herein to restrain
the commission, and, failing to satisfy this test, he cannot succeed.

3. A provision in the contract in substance provides for the
exchange between the city and the railroad companies of certain
pieces of real estate and the contribution by the city of any excess
in valuation of the real estate conveyed by it toward the expense of
relocating streets and eliminating grade crossings as provided in

the plan adopted. The excess in value of the property conveyed by the city to the railroads over that conveyed by the railroads to the city is found to be a little less than one hundred thousand dollars. *Held*, that it was lawful for the commissioners to provide that the city should contribute this excess toward the expenses in question, and to make this agreement before the respective values of the lands to be exchanged had been ascertained by a commission as provided in the statute.

4. Plaintiff complains of the provisions of the contract in respect of Liberty street that they fail to provide for compensation to be paid by the companies to the city for the fee of the street. *Held*, that there are no findings or requests to find that title to that street was ever acquired by the city; further, that if the land belongs to the city it will simply be necessary that ordinary condemnation proceedings, or proceedings for appraisal under the Terminal Act shall be had to ascertain the payment to be made by the company to the city for such lands.

5. The contention that the entire arrangement involving the exchange of city property on Liberty street and the slip for the fire boat at the Clark and Skinner canal for another tract in the vicinity to be used by the city for fire purposes is utterly beyond the authority and power of the terminal commission and void and that it is such an integral part of the entire contract that the whole structure must fall with it, is not tenable.

6. Objection is made that the contract is invalid because it allows one track still to cross Main street at grade and another on a viaduct and allows the construction west of Main street of a short extension of a track already there and for a short distance of an additional track which produces an additional street crossing at grade. *Held*, that it is not subject to such objection; that the contract is to be considered in its entirety, and that when so considered it appears that many grade crossings have been eliminated; moreover, that the sole purpose of the act is not to secure the elimination of grade crossings, but also to secure the extension of terminal facilities and conveniences, and, therefore, the commissioners were entitled to take into account that result in making the contract, and further that the contract permitting additional pieces of track to be laid in Water street contravenes neither the Constitution (Art. 3, § 18) nor the Railroad Law (Cons. Laws, ch. 49, § 21).

7. While the contract provides for the closing and abandonment of certain streets, this fairly refers to the termination of public easements therein and does not mean that the defendants may take physical possession thereof and destroy private ease-

ments therein until proper provision has been made for compensation. If the defendant companies should attempt to pursue any different course, the property owners would be able to find ample means of legally protecting their rights.

8. By two clauses of the contract the railroad companies agree to use a passenger station proposed to be constructed by them for all of their regular trains for a period of fifteen years. The city of Buffalo would have the right to utilize all legal methods to prevent them from voluntarily abandoning such use during said period, and the companies cannot, after that period, make any change without the consent and approval of the public service commission, and this is a practical and far-reaching safeguard against any attempt by the companies to take advantage of the city under these clauses.

*McCutcheon* v. *Terminal Station Comm.*, 168 App. Div. 301, affirmed.

(Argued November 23, 1915; decided January 25, 1916.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered July 16, 1915, affirming a judgment in favor of defendants, respondents, entered upon a dismissal of the complaint by the court on trial at an Equity Term in an action brought by plaintiff as a taxpayer to restrain as wasteful and illegal the execution of a contract made by the defendants Fuhrman and others, constituting the terminal station commission, in behalf of the city of Buffalo with the defendant railway companies, also motion on behalf of respondents to dismiss the appeal of the city of Buffalo.

The facts, so far as material, are stated in the opinion.

*Simon Fleischmann, Roland Crangle, B. Frank Dake* and *Edward L. Jung* for appellant. It was not necessary to close Front street, or. any part thereof, to secure to the public freedom from the obstruction of the streets of the city by railroads, or adequate services and facilities to the railroad for the transportation of passengers, freight and property. (*People ex rel. Frost* v. *Woodbury,* 213 N. Y. 51; *B. H. R. R. Co.* v. *Steers,* 213 N. Y.

9

76.)   The parties to the terminal contract and the trial and appellate courts were, and are, alike legally bound to treat Front street as a public street.   (*Martin* v. *Gilbert,* 119 N. Y. 298; *Matter of Village* v. *Steyner,* 135 N. Y. 341; *City of New York* v. *Johns-Manville Co.,* 155 App. Div. 905; Bigelow on Estoppel [5th ed.], 370.) The public rights in and to Front street, which borders on Buffalo river, itself a public highway and a navigable stream, include the right to use the same for docking purposes, as well as for general street purposes. (*Potomac Steamboat Co.* v. *U. P. Steamboat Co.,* 109 U. S. 672; *Vil. of Pewaukee* v. *Savoy,* 103 Wis. 271; *Turner* v. *People Ferry Co.,* 21 Fed. Rep. 90; *Haight* v. *Keokuk,* 4 Iowa, 199; *People* v. *Lambier,* 5 Den. 9; *City of Buffalo* v. *D., L. & W. R. R. Co.,* 190 N. Y. 84; *Langdon* v. *Mayor, etc.,* 93 N. Y. 150; *Wetmore* v. *Gaslight Co.,* 42 N. Y. 384; *Gardner* v. *Tisdale,* 2 Wis. 153; *Barclay* v. *Howell,* 6 Pet. 498; *Culledge* v. *Larned,* 8 Pick. 508; *Morris* v. *U. S.,* 174 U. S. 196.)   Front street being a public highway and a public dock, its closing and the permanent exclusion of the public therefrom, constituted a gross abuse of power and discretion on the part of the terminal commission, involving an illegal arrogation of power and rendering the terminal contract void.   (*Ill. C. R. R. Co.* v. *Chicago,* 176 U. S. 646.)   The unreasonableness or abuse of the exercise of such discretionary powers as are lodged in the terminal commission may be reviewed by the courts and present questions of law. (*Fire Dept.* v. *Gilmore,* 149 N. Y. 453; *People* v. *Bd. of Health,* 140 N. Y. 1; *People ex rel. Steward* v. *R. R. Comrs.,* 160 N. Y. 202; *People ex rel. Potter* v. *Bd. R. R. Comrs.,* 124 App. Div. 47; *Matter of Buffalo F. T. R. R. Co.,* 131 App. Div. 503; *People ex rel. Sawyer* v. *R. R. Comrs.,* 128 App. Div. 814; Lewis on Em. Domain [3d ed.], § 599; *City of Rome* v. *Whitestown W. W. Co.,* 113 App. Div. 547; *R. & S. R. R. Co.* v. *Davis,* 43 N. Y. 137; *State* v. *Com. of Mansfield,* 23 N. J. L. 510.)   The contract

between the terminal commission and the railroad companies is illegal in that it undertakes to give property of the city of Buffalo to those companies without consideration to the city. (Const. of N. Y. art. 8, § .10.) Neither the provision of the terminal contract, whereby the city is to contribute to the elimination of grade crossings, the difference in value in its favor resulting from the exchange of lands, nor that providing that the railroad companies shall bear the other expenses to be incurred in connection with the relocation of streets or enlarged terminal facilities, relieves from illegality the provision of the contract whereby the city waives the payment of such excess value in lands to be exchanged. (*Colon* v. *Lisk*, 153 N. Y. 188.) The city is entitled to compensation for the fee of the streets to be closed and turned over to the railroad company to which the city owned the fee. (*Story* v. *N. Y. El. R. R. Co.*, 90 N. Y. 122; *Darlington* v. *City of New York*, 31 N. Y. 164; *Matter of Ninth Ave.*, 45 N. Y. 729; *City of Brooklyn* v. *Copeland*, 106 N. Y. 496; *Durkin* v. *City of New York*, 146 App. Div. 272; *Matter of Grade Crossing*, 66 App. Div. 439; *Clinton* v. *C. R. & M. R. R. R. Co.*, 24 Iowa, 455.) The placing of dangerous obstructions and the retention of a crossing at grade in Main street near Buffalo river constituted an illegal exercise of power by the terminal commission. (*D., L. & W. R. R. Co.* v. *City of Buffalo*, 158 N. Y. 266.) The contract is void in that it assumes to give the railroad a franchise to lay further tracks in and across Commercial and Water streets at grade, in addition to the tracks at grade now in those streets. (*Matter of N. Y. El. R. R. Co.*, 70 N. Y. 327; *Matter of Henneberger*, 155 N. Y. 420; *Sun Publishing Association* v. *Mayor, etc.*, 152 N. Y. 257; *I. C. R. R. Co.* v. *Chicago*, 176 U. S. 646.) The terminal commission had no power to contract on behalf of the city for the construction by the railroad for the city of a fire tug berth. (*Coykendall* v. *Water Comrs.*, 150 App. Div. 46; 206 N. Y. 657.)

*William S. Rann, Corporation Counsel (Ralph K. Robertson* of counsel), for city of Buffalo, appellant. The terminal commission had no power to waive the payment of $98,000 excess awarded to the city in the appraisal proceeding for the exchange of lands between the city and the railroad companies. (*Simon* v. *Bradley,* 207 N. Y. 592; *Colon* v. *Lisk,* 153 N. Y. 188.) Front street is, and for many years past has been, both a public street and a public dock. (*People* v. *Lambier,* 5 Den. 9; *Potomac Steamboat Co.* v. *U. P. Steamboat Co.,* 109 U. S. 672; *Matter of City of New York,* 216 N. Y. 67; *Langdon* v. *Mayor, etc.,* 93 N. Y. 150; *Haight* v. *Keokuk,* 4 Iowa, 199; *Barney* v. *Keokuk,* 94 U. S. 324; Elliott on Roads & Streets [2d ed.], § 117; *Wyman* v. *Mayor of New York,* 11 Wend. 486; *Requa* v. *Rochester,* 45 N. Y. 129; *Rudolph* v. *Ackerman,* 58 App. Div. 596; *Demopolis* v. *Webb,* 87 Ala. 655; *Webb* v. *Demopolis,* 95 Ala. 116, 126; *Buffalo* v. *D., L. & W. R. R. Co.,* 39 N. Y. Supp. 4; *Des Moines* v. *Hall,* 24 Iowa, 234; *Palmer* v. *City of Clinton,* 52 Ill. App. 67.) The commission has no power to close Front street to the public and at the same time adopt a plan whereby it will remain substantially open as a private passageway for the sole benefit of the defendant railroad companies for marine facilities. (*Ontario Knitting Co.* v. *City of New York,* 205 N. Y. 409; *Simon* v. *Bradley,* 207 N. Y. 592.) The terminal commission has no authority to decide whether or not the city is entitled to compensation for the extinguishment of the public easement of travel in streets in which the city does not own the fee, but should have provided for such determination by an appraisal commission. (*Matter of Myer* v. *Adam,* 63 App. Div. 540; 169 N. Y. 605; *People ex rel. Myer* v. *Adam,* 74 App. Div. 604; *People ex rel. Bolza* v. *Adam,* 79 App. Div. 306; *People ex rel. Crane* v. *Adam,* 83 App. Div. 620; *D., L. & W. R. R. Co.* v. *City of Buffalo,* 158 N. Y. 266; *Ontario Knitting Co.* v. *State,* 205 N. Y. 409; *People* v. *Kerr,* 27 N. Y. 188; *Matter of*

*Ninth Ave.*, 45 N. Y. 729; *Durkin* v. *City of New York*, 146 App. Div. 272; *City of New York* v. *Rice*, 198 N. Y. 124.) The commission has no right to provide for the construction of an elevated track across Main street which requires the location of various steel pillars within the street lines, particularly in the center of the street. (*D., L. & W. R. R. Co.* v. *City of Buffalo*, 158 N. Y. 266.) The commission has no power to grant the right to the railroad company to lay tracks at grade in streets, particularly where no tracks now exist. (*People ex rel. Simon* v. *Bradley*, 207 N. Y. 592; N. Y. Const. art. 3, § 18.)

*Wilber E. Houpt* for terminal station commission, respondent. The terminal commission having acted within the scope of its powers in adopting the plan and entering into the contract in question, and there being no charge of fraud, bad faith or collusion in relation to the acts of the commissioners in respect to said plan or contract, the court is concluded by the decision of the terminal commission and cannot review such decision in this action. (Dillon on Mun. Corp. § 1585; *Talcott* v. *City of Buffalo*, 125 N. Y. 230; *Kittinger* v. *Buffalo Traction Co.*, 160 N. Y. 377; *Holtz* v. *Diehl*, 26 Misc. Rep. 224; *Govers* v. *Bd. of Suprs.*, 171 N. Y. 403.)

*Charles B. Sears, Louis L. Babcock* and *J. Leroy Kenefick* for New York, Lackawanna and Western Railway Company et al., respondents. The sole question in relation to the plan and contract involved in this litigation relates to the legality of the commissioners' acts in adopting the plan and making the contract under the Terminal Act. The question is solely as to the power of the commissioners. (*Talcott* v. *City of Buffalo*, 125 N. Y. 280; *Ziegler* v. *Chapin*, 126 N. Y. 342; *Govers* v. *Bd. of Suprs.*, 171 N. Y. 403; *Kittinger* v. *Buffalo Traction Co.*, 160 N. Y. 377.) The court has not power in a taxpayer's action to review the discretionary act of the terminal

station commissioners in adopting the plan in question. (Dillon on Mun. Corp. [5th ed.] §§ 242, 1585; 5 McQuillan on Mun. Corp. § 2577; *Talcott* v. *City of Buffalo*, 125 N. Y. 280; *Kittinger* v. *Buffalo Traction Co.*, 160 N. Y. 377; *Holtz* v. *Diehl*, 26 Misc. Rep. 224; *Hearst* v. *McClellan*, 102 App. Div. 336; *Schauck* v. *Mayor, etc.*, 69 N. Y. 444; *Govers* v. *Bd. of Suprs.*, 171 N. Y. 403; *People ex rel. Copcutt* v. *Board of Health*, 140 N. Y. 1; *People ex rel. Steward* v. *Railroad Comrs.*, 160 N. Y. 202; *People ex rel. T. & H. Co.* v. *Railroad Comrs.*, 126 App. Div. 492; *People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Public Service Com.*, 195 N. Y. 157; *People ex rel. Potter* v. *Public Service Com.*, 124 App. Div. 47; *People ex rel. Sawyer* v. *Board of Railroad Comrs.*, 128 App. Div. 814; 184 N. Y. 575; *People ex rel. Amm* v. *Railroad Comrs.*, 103 App. Div. 123.) Adoption of the plan in question was not beyond the discretionary power of the terminal station commissioners because the improvement involved the closing of Front street, so called, Washington, Indiana, Love alley, Illinois, Mississippi, Liberty, Columbia and other streets. · (*Schauck* v. *Mayor, etc.*, 69 N. Y. 444; *Beckwith* v. *Whalen*, 70 N. Y. 430; *Rickerton* v. *Village of Saranac Lake*, 73 Misc. Rep. 52; 151 App. Div. 911; *Smith* v. *Smythe*, 197 N. Y. 457; *City of Buffalo* v. *D., L. & W. R. R. Co.*, 190 N. Y. 84; *Johnson* v. *Grinnell*, 188 N. Y. 407.) The terminal station commissioners acted within their discretionary power in providing for an extra track in Water street for a distance of about 350 feet from the westerly side of the Commercial Slip. (*C., B. & Q. R. R. Co.* v. *Nebraska*, 170 U. S. 57; *Wabash R. R. Co.* v. *Defiance*, 167 U. S. 88.) The provisions of the plan and contract giving to the companies the right to construct and operate an extension of the existing additional or second track now in Water street and across Commercial Slip do not violate the state constitutional prohibition against the legislature passing a private or local bill granting to a private

corporation the right to lay down railroad tracks. (*Matter of Gilbert El. R. R. Co.*, 70 N. Y. 361.) The contract is not illegal because of the provisions contained in paragraph fifth thereof to the effect that if the appraised value of the land agreed to be conveyed by the commission to the New York, Lackawanna and Western Railway Company shall exceed the appraised value of the land agreed to be conveyed by these defendants to the city, then in view of the fact that the abandonment of Water, Prime, Ohio and Washington streets, as well as other streets included in said plan, and the relocation of Ohio street, are necessary for the elimination of the grade crossings and railroad tracks in said streets, and in view of the fact that the company has therein agreed to assume and pay in the first instance all the expense of the relocation of streets and elimination of grade crossings therein provided for, the city of Buffalo shall assume and bear such excess which shall be taken as the measure of that part of the expense of the elimination of grade crossings and relocation of streets therein provided for which the said city is thereby obligated to assume and bear. (*People ex rel. Simon* v. *Bradley*, 207 N. Y. 592; *Colon* v. *Lisk*, 153 N. Y. 188; *People ex rel. Kemmler* v. *Durston*, 119 N. Y. 569; *Shedlinsky* v. *Budweiser Brewing Co.*, 163 N. Y. 437; *Cohen* v. *B. & J. Envelope Co.*, 166 N. Y. 292; *People* v. *Kerr*, 27 N. Y. 188; *Craig* v. *R., C. & B. R. R. Co.*, 39 N. Y. 404; *Peck* v. *Schenectady Ry. Co.*, 170 N. Y. 298; *Kellinger* v. *F. S. St. R. R. Co.*, 50 N. Y. 206; *Matter of Grade Crossing Comrs.*, 66 App. Div. 439.) The contract and plan are not invalid for the reason that streets of which the city does not own the fee are closed without any provision for compensation to the city in respect thereto. (*Matter of Mayor, etc.*, 28 App. Div. 143; 157 N. Y. 409.)

Hiscock, J. This appeal presents to us for consideration for the first time a contract made in behalf of the city

## 136    McCutcheon v. Terminal Station Comm.

of Buffalo with certain railroad companies by the Buffalo Terminal Station Commission, claiming to act under and in accordance with chapter 842 of the Laws of 1911, entitled "An act creating a railway terminal station commission of the city of Buffalo, defining its powers and authorizing said city to issue its bonds." As we are aware, that statute was passed for the purpose of enabling the city of Buffalo to solve problems of great importance created by the entrance into its limits of many of the great railroad systems of the country and for the solution of which the earlier Grade Crossing Act had proved inadequate. It created a commission consisting of the mayor and commissioner of public works of the city, the chairman of the grade crossing commission and nine other members upon whose responsibility, experience and general judgment no criticism seems to be passed, and conferred upon it broad powers, acting in behalf of the city of Buffalo, not only to secure the elimination of crossings of streets at grade by tracks but also to enable and require the railroad companies to furnish better terminal facilities for the travel and shipment respectively of passengers and freight. The act was not in all respects skillfully framed or clearly worded, and in the case of *People ex rel. Simon* v. *Bradley* (207 N. Y. 592) this court was called upon to decide whether it was not unconstitutional and void, the most important contention in that behalf being the one that it violated the Constitution by providing for the contribution of municipal moneys or credit for the benefit of the railroad corporations. After a thorough consideration of its terms and in an opinion by Judge Chase which analyzed fully and carefully all of its provisions, it was held that on a reasonable interpretation thereof it was not unconstitutional and especially it was held that the elimination of grade crossings and the relocation of streets in connection therewith were city purposes towards which the city might contribute without violating the Constitution.

Claiming to act under and in accordance with the provisions of said act, the commission in behalf of the city of Buffalo has made an important contract with the Delaware, Lackawanna and Western Railroad Company and the New York, Lackawanna and Western Railway Company, whereby, as it is insisted, the general purposes of the statute were properly and legally carried out by procuring from the railroads much more adequate and convenient terminal facilities for travel and shipment of freight whether purely inland or transshipped between lake and railroads and by the elimination of many grade crossings.

The plaintiff as a taxpayer attacks practically all of its important provisions as being either violative of, or unauthorized by, the terms of the statute or as so sacrificing the interests of the city of Buffalo to the advantage of the railroads as conclusively to indicate that the commissioners in making them either were lacking in honesty and good faith or failed to employ that reasonable and intelligent wisdom and discretion which they were bound to exercise.   He has been unanimously defeated in these claims by the trial court and by the Appellate Division.

The first challenge which he encounters on his appeal to this court is to his right to maintain this action, it being urged that relief should have been sought by him by direct review of the proceedings of the commissioners. . We shall assume, however, without discussion that he is entitled to present in a taxpayer's action all the complaints which he has been urging.   But even so, it is well that in such an action as this, involving large questions of public importance, there should be kept clearly in mind the undoubted and very narrowing restrictions which control our consideration of this appeal.

In the first place, even if we could consider and draw our own conclusions from the evidence which has been presented, it would be neither our duty nor our right to substitute our judgment for that of the commission in

weighing and balancing against each other mere advantages and disadvantages accruing to the city from the contract.    The commission has been selected lawfully and we must assume with proper consideration of qualifications to do this, and the city must accept the responsibility for its action whether wise or unwise, so long as such action is within the authority of the statute, and characterized by good faith, and free from fraud or corruption. In thus writing, we of course do not intend to express any opinion concerning the general merits of the plan. As against the attacks of the plaintiff upon it, we do not overlook the circumstances that it was adopted after a public hearing held in accordance with the terms of the statute and full consideration; that it is substantially the plan approved by the Public Service Commission of the state after a long investigation; that it was approved with one exception by all the Terminal Commissioners including the mayor of the city and that the common council of the city has adopted resolutions directing the corporation counsel to discontinue his appeal in behalf of the city from the judgment dismissing plaintiff's complaint, and which circumstances, it is urged, furnish much evidence of the exercise of proper deliberation and that care and wisdom have been exercised to safeguard the interests of the city.    We write as we do simply to emphasize at the outset the principle which limits our power of review.

In the second place, we are not at liberty to examine the evidence to any extent.    By the unanimous affirmance by the Appellate Division of the decision of the trial court we are concluded by the findings of that court. There are amongst these findings those which directly and broadly reject plaintiff's claims of errors and shortcomings on the part of the commission and approve the action of the latter, and, therefore, force plaintiff to assume the burden of showing that these general findings which are fatal to his claims are nullified by other findings of vari-

ous specific facts and circumstances which must lead us irresistibly and conclusively to the decision that his complaints are well founded.

With these general observations upon our powers we pass to a consideration of some of the more important objections made by plaintiff to the contract which is before us, and in order to make our discussion intelligent, it will be necessary to describe in a brief and general manner the location of streets, stations and tracks as they existed when the contract was executed and the more important changes approved by the commission in order to carry out the purposes of the statute.

In the city of Buffalo, Main street, as its name implies, is an important street. It runs substantially north and south, terminating at its southern end on the Buffalo river which is an important navigable body of water extending easterly and westerly and serving as a passageway between certain portions of the city of Buffalo and Lake Erie. Extending along the northerly bank of this river east of Main street was an open strip of land two rods wide known as Front street, more or less covered with and obstructed by docks owned by the defendant railroad companies and to a considerable extent traveled by the public. A short distance north of and parallel with this so-called street was another street known as Ohio street, and easterly from Main street were several streets running on lines substantially parallel with it and terminating in Front street. There also were several streets westerly and not far from Main street running in a northerly and southerly direction to or across defendants' tracks. Defendants' passenger station was located just west of Main street not far from the northerly bank of Buffalo river and in the same vicinity were located a freight house much used in connection with lake transportation and a coal trestle over which more than a million tons of coal were handled in each year. The tracks leading from the east to this passenger station and freight house

and coal trestle ran through a portion of Ohio street and across Main street and various streets east and west thereof at grade making many dangerous crossings.

Under the contract in question it is proposed, amongst other things, to locate a passenger station on the easterly side of Main street at or near its point of intersection with Front street, to close Front street for a distance of about sixteen hundred feet easterly from Main street, to relocate a portion of Ohio street somewhat north of its present location and to close the ends of the streets east of Main street running into Front street within the distance of sixteen hundred feet above mentioned, and to construct modern docks on the bank of Buffalo river in close proximity to the proposed new station, to eliminate the crossing of Main street and other streets at grade by several tracks and to lay down in the street known as Water street west of Main street for a short distance an additional track.

There is no claim that the situation originally existing was not an inconvenient, congested and more or less dangerous one which came within the jurisdiction of the Terminal Commission, and there is and can be no well-founded denial that the plans adopted by the contract under review will eliminate a great amount of crossing at grade of streets by defendants' trains and afford much more convenient terminal facilities both for passenger and freight traffic. Neither is there any denial that it was a practical necessity to retain the defendants' terminals within the limits of a very restricted area surrounding the junction of Main street and the Buffalo river. The substantial complaint in its final analysis is that the commission ought to have adopted some other plan, such for instance as the one proposed by plaintiff, and thereby have avoided doing certain things which he now attacks as unnecessary and illegal.

In testing the action of the commission under these attacks, it is not necessary even to summarize at this

point all of the broad powers which were conferred upon it, but it may be profitably here called to the attention that the act did specifically confer amongst other powers the ones, when in its judgment it was necessary so to do in order to accomplish the purposes contemplated by the act, to close and change the location of public streets and places, to buy, sell and exchange real estate, change the location of stations, tracks and various street structures, and bind the city to the payment of various expenses which might be incurred in these steps.

The closing of Front street is assailed more bitterly than any other provision of the contract and will be considered first.

In my opinion there would be a chance for serious discussion whether the strip of land known as Front street had been legally laid out and accepted by the municipality of Buffalo or its predecessors as a street at the time the contract was executed. Amongst other facts found by the trial court, and some of which by themselves tended to support plaintiff's theory that it was a public street, were the ones that "neither the city of Buffalo nor its predecessors nor any other person ever opened or worked as a highway the premises herein designated as Front street," and that "the strip of land along Buffalo river from Main street to Michigan street * * * designated as Front street * * * was never opened or laid out as a street or traveled or used as a highway after the adoption of the resolution * * * purporting to establish it as a street two rods in width."

Of course it is not forgotten that in *City of Buffalo v. Del., L. & W. R. R. Co.* (190 N. Y. 84) this court reached the conclusion that Front street was a public street. But that decision was based on the findings presented in that particular case and the underlying idea was that it having been found in effect that Front street had come into existence as a public street the other facts

found did not warrant the conclusion adopted by the trial court that the street had been closed by abandonment and disuse. There were lacking the findings now presented to us and to which reference has been made to the effect that the street was never "opened or worked as a highway" and was "never opened or laid out as a street or traveled or used as a highway after the adoption" of a certain resolution purporting to establish it as a street.

But it does not seem necessary or even desirable to review at the great length which would be required all the facts found in this case and the law applicable to the establishment of highways and streets for the purpose of determining whether Front street in fact had been legally opened and established as a city street. The Terminal Commissioners in making their contract with the railroads assumed that it was a public street and the trial court necessarily proceeded on the same theory when it held that it was necessary and proper for the commissioners to provide for closing it. I shall follow the same view which of course is the one more favorable to the appellant.

The findings abundantly establish that as part of the general plan adopted the closing of Front street, in connection with the agreement secured from the defendants to construct modern docks thereon at the margin of Buffalo river, will result in the elimination of grade crossings and will greatly increase the terminal facilities at the new passenger station to be erected by and at the expense of the railroad companies and to be employed in the transshipment of passengers and freight between railroads and lake boats; that the space thereby to be afforded is absolutely necessary in the loading and unloading of a modern boat, and that such closing is necessary and proper. I do not understand any serious dispute to be made of the proposition that the commission possessed, generally speaking, the power to close streets when necessary and proper to accomplish such purposes as these.

I do not suppose that there can be any doubt of the right of the legislature, acting directly or through a commission, to close a street as against public easements and divert travel elsewhere when deemed necessary to perfect or subserve public improvements and convenience. The act creating the commission expressly confers this power, and this court has held that that act is constitutional. The plaintiff, however, denies that said commissioners under all of the facts found did have the power to close this particular street, and argues that their act in so doing is for various reasons, which will be examined, unlawful.

At plaintiff's request the court found that as an engineering and physical matter it would have been possible to have adopted some plan which did not call for the closing of Front street, and it is urged that the plans submitted by plaintiff which avoided such closing should have been accepted. The defendants, on the other hand, insist that there were objections to plaintiff's plans which made them utterly impracticable. In so far as this branch of the plaintiff's argument is reducible to the proposition that the commission might have adopted some plan which merely would have been wiser and better than the one which it did adopt, it obviously must fail. The contentions of the various parties concerning the merits of the different plans considered by the commission sufficiently illustrate the fact that human ingenuity would never be able to devise any plan which would suit everybody, and the commission was clothed with the power in behalf of the city to pass upon the merits of the various plans which might be proposed, and, as has already been stated, its conclusion within certain limits is controlling upon us. Counsel doubtless fully appreciates this, for he then argues with great earnestness what is his fundamental contention, that the plan adopted by the commission closing Front street involves such a surrender of public rights of travel and dockage through and upon said

street and such a gift of dockage rights to the railroad companies that it transgresses the limits of fair discretion and intelligent judgment and becomes a gross and unlawful abuse thereof involving bad faith.

If we were convinced that the contract did result in taking from the city of Buffalo and in presenting to the railroad companies such valuable rights as are described by counsel, we should be loath to affirm the present judgment if some proper ground could be found for doing otherwise. We think, however, that his argument is founded upon a very substantial and far-reaching misconception both of the facts and of the law which are controlling upon us and which when correctly viewed place upon this provision an entirely different aspect than the one entertained by him.

Front street is only two rods wide. The abutting land upon the inland side and the fee of the bed of the street are owned by the railroad companies, with possibly the exception of one or two inconsequential bits. Said strip of land from a date probably not antedated by its use for street purposes has been covered with docks and warehouses which have been and are the private property of the defendant companies and their predecessors. For many years the public has been accustomed to use the street for travel both by pedestrians and vehicles, but this travel has been to some extent obstructed by structures upon it and by the use of the docks for loading and unloading boats, and in addition the docks have now fallen into such a condition of disrepair that they have become dangerous for travel both by pedestrians and vehicles, and the amount of travel has steadily declined. The greater portion of this travel has been by people having business with the docks, warehouses and boats lying thereat, but to a lesser extent the street has been used by those desiring to reach the streets terminating in Front street already referred to and the Clark and Skinner canal, so called, near its easterly end.

The plan which has been adopted calls for the closing of the ends of the streets running into Front street in order to provide a place for the actual location of tracks, and while plaintiff's counsel criticises a plan which, as he says, eliminates grade crossings by eliminating streets, nobody seriously questions the power of the commission to close these streets, and hence there would be no further occasion to use Front street, if left open, for the purpose of reaching them. The Clark and Skinner canal, so called, completely interrupts travel through Front street near its easterly end. It has ceased to be used for commercial purposes and is now used by the city as a station for part of its fire apparatus, and hence the discontinuance of travel to this point will be a matter of negligible consequence. There would still remain the use of Front street, if left open, by people desiring to visit the docks, warehouses and boats, but inasmuch as the defendant companies are agreeing to erect at much expense to themselves modern and extensive docks in this space, it is safe to assume that they will urge upon, rather than deny to the public, the right to use this space although closed as a street, for this purpose. It, therefore, seems to me that there will be no substantial loss of public use of this strip of land for street purposes under the plan in question.

Great stress is placed upon the alleged loss by the city of Buffalo through this contract of the water front on the Buffalo river along Front street. But before and independent of the present contract the city of Buffalo did not have the right to construct and use docks upon Front street and collect wharfage fees. Those rights have always been lodged in and owned by the defendants and their predecessors. When this contract was executed the public had the right to use Front street, as it had been used, for street purposes, but subject to this right the defendants had the right as owners of the abutting lands and of the fee of the street to construct docks and collect fees for the use thereof. This right was

10

exclusive so far as concerned dockage and wharfage rights and privileges, although it could not be exercised in a manner to conflict with the use of Front street for street purposes. All this was broadly and thoroughly decided in the case of *City of Buffalo* v. *Del., L. & W. R. R. Co.* (190 N. Y. 84). It is now urged, it is true, that what was said upon this subject was uncalled for and not decisive, but we think that view is erroneous. The court was required to pass upon the conflicting rights of the city and the railroad companies, and we do not think that anything which was said by Judge VANN upon this subject was irrelevant. Moreover, if we should pass over and beyond this case, we should find that what was there written by Judge VANN was in accord with the established law of this state; that under such circumstances as exist in respect of Front street, the abutting owner alone may erect docks, which it is true will be subject to public street travel, but for the use of which he will be entitled to collect all fees. (*Verplanck* v. *Mayor, etc., of N. Y.*, 2 Edw. Ch. 220; *Steers* v. *City of Brooklyn*, 101 N. Y. 51; *Town of Brookhaven* v. *Smith*, 188 N. Y. 74; *Matter of City of New York*, 216 N. Y. 67; *Fanning* v. *Osborne*, 102 N. Y. 441.)

Undoubtedly the closing of Front street will enable the defendant companies profitably to construct new and modern docks upon their land now covered by said street, as they have agreed to do, and in that manner will increase the value of their property. They had just as great a right before as they will have after the contract to construct such docks, but it is found that it would have been impossible to build docks by which modern lake boats could be accommodated without the use of the space now occupied by Front street for purposes of loading and unloading cargoes, and if the street had been kept open the companies would not have been entitled to so use these docks as to obstruct the use of the street by a

single person who desired to travel through the same, however inconsequential such right might have been.

It does not follow, however, that any increment which may accrue in the value of the defendants' property by reason of closing Front street will be accompanied by a corresponding surrender and sacrifice of public rights. In addition to the facts limiting the use of Front street for street purposes already referred to, it has been found in substance that the present docks are entirely inadequate to accommodate modern boats and that they and the warehouses thereon are falling into disrepair and decay and that "for many years last past the value and useability of the property situate south of Ohio street, east of Main street, west of Michigan street and bounded on Buffalo creek has been steadily declining;" that travel upon the streets intersecting this area has steadily declined "along with the decline of business transacted on this portion of the water front." So it results that under the contract closing Front street the defendant companies secure additional space which will permit the operation and doubtless increase the value of terminal facilities to be constructed at their expense, and the city will give up certain very limited rights of passage through the street which have been sufficiently described and secure increased terminal facilities, and in addition the closing of the street is a well-defined part of a plan which secures the elimination of grade crossings.

It may or may not be that the railroad companies are getting the better of this bargain. That is a question which can be, as it is, earnestly debated and we do not pretend to decide it. But whatever the answer to that question may be, it is perfectly clear that no adequate basis is found in a correct conception of the facts and principles of law which are binding upon us on this appeal, for the proposition that the action of the commission is so utterly unjustified by any fair reason and results in such unmitigated and overwhelming disadvan-

tages to the city of Buffalo that it bears upon its face evidence which is conclusive upon us of fraud, corruption and bad faith.

This is the test by which upon this appeal must be measured the right of plaintiff in a taxpayer's action to restrain the action of the commission, and failing to satisfy this test, he cannot succeed. (*Talcott* v. *City of Buffalo*, 125 N. Y. 280; *Ziegler* v. *Chapin*, 126 N. Y. 342; *Govers* v. *Board of Supervisors, Westch. Co.*, 171 N. Y. 403; *Schanck* v. *Mayor, etc., of N. Y.*, 69 N. Y. 444; Dillon on Municipal Corporations [5th ed.], sections 242 and 1585; McQuillin on Municipal Corporations, section 2577.)

The provision in the contract most bitterly attacked after the one already discussed, in substance provides for the exchange between the city and the railroad companies of certain pieces of real estate and the contribution by the city of any excess in value of the real estate conveyed by it to the expense of relocating streets and eliminating grade crossings as provided in the plan adopted. The real estate to be conveyed by the city consists of portions of certain streets to be closed and to be actually occupied by tracks under a plan which eliminates much use and crossing of streets at grade, and the property to be conveyed by the railroad companies consists of certain parcels which are to be used in carrying out said plan by supplying new street space in place of those closed. It has been found that the excess in value of the property conveyed by the city is a little less than one hundred thousand dollars.

The provision is attacked on the grounds, *first*, that it was unlawful for the commission to provide that the city should contribute this excess toward the expenses in question; and, *second*, that in any event it was unlawful for the commission to make this agreement until the respective values of the lands to be exchanged had been ascertained by a commission as provided in the statute.

The statute (L. 1911, ch. 842, section 5) provides that the commissioners "may agree upon behalf of said city with any company for the change of location or grade of any street * * * which may be necessary, and may agree with said companies for the exchange or sale of lands owned by said city at a price therefor to be determined as hereinafter provided." The latter provisions are for the appointment of commissioners "to ascertain the fair market value of any lands to be sold or exchanged by the city," and then there is provision for the payment to the city of any sum which may become due on said valuation.

The changes in the location of streets and of structures in streets which the commissioners were authorized to make were those which in their judgment might be necessary "to secure to the public freedom from the obstructions of the streets of said city by railroads and adequate services for the transportation of passengers, freight and property in the use of the railroad tracks, switches, terminal stations and facilities."

It seems clear that the commissioners were authorized to make a contract for the exchange of these lands and if the contract had followed the ordinary course pointed out by the statute by providing for the ascertainment through a commission of their relative values and for the payment to the city of any excess in value of its lands there would have been no basis for serious debate about the legality of the provision. The trouble, if any, therefore, arises over the provision made, before values had been ascertained as provided by the statute, that this excess should be contributed by the city toward the expenses incurred in the relocation of streets and the elimination of grade crossings.

I regard it as settled by our decision in the *Bradley* case that the city could contribute towards the expenses incurred in relocating streets and constructing street crossings as the same might be necessary under the plan

to eliminate grade crossings and increase terminal facilities. The statute clearly thus provides and Judge Chase in his opinion in the *Bradley* case wrote that expenditures for the elimination of grade crossings or "for street purposes * * * made necessary by the changes in the terminal facilities of the railroads provided by the plans adopted by the commissioners * * * are * * * city purposes and the expenditures therefor proper public expenditures." (p. 619.)

The trial court has found that certain expenses incurred and in the first instance paid by the railroad companies in closing streets, in re-erecting and constructing certain bridges and viaducts therein for tracks and in relocating Ohio street, all as provided in said plan, exceeded the sum of $500,000 or five times the amount to be contributed by the city. It, therefore, again seems clear that the commission had the right to provide for the contribution by the city towards the purposes specified of a sum equal to this excess in valuations and that it might provide for the payment of such contribution by the application of the balance due to it on the exchange of real estate as well as by municipal warrant. It, of course, cannot be a vice in the contract if otherwise legal that, instead of providing that a sum due from the railroads to the city should be paid by the former in cash, and that the contribution due from the city to the railroads on account of these expenses should then be paid by the city back to the railroads. Legal proceedings do not require that business usages should be violated and hampered by any such cumbersome methods.

The only real question in connection with this provision, therefore, is whether it was rendered invalid by the fact that the commissioners agreed to this contribution before it was authoritatively ascertained just what the contribution would amount to. I hardly think that this result follows. The provision for ascertainment of values by a commission was not intended to cover this particular

form of transaction.   It was adopted as the authoritative
method of ascertaining values when such exact ascertain-
ment was essential to carry out a transaction of exchange
between the city and the railroads.   Where a balance
was to be paid in money it was essential that the balance
should be exactly determined in some manner and this
method was prescribed by the statute.   But in my opinion
the statute does not fairly provide that the commission,
determining that the city should contribute to the defray-
ment of certain lawful expenses and deeming it wiser that
this contribution should consist of the balance made by
it on an exchange of real estate involved in the plan
rather than of some fixed amount of money, nevertheless
could not include a clause expressive of such determination
in its contract until after proceedings to appraise the real
estate.   It is not essential to such contribution that the
exact amount of the balance should be known when the
agreement is made as would be necessary when the bal-
ance was to be settled by payment, and for the purpose of
securing an agreement the commission might deem it
best to consent to contribute the profit to be made by the
city on the exchange whether it should be larger or
smaller within reasonable limits.   It very likely might
be safer and wiser for the commission to have the amount
of this balance fixed at the time of the execution of the
contract or to limit by some definite sum the amount
of the contribution to be made out of said balance, but
I do not think that the failure to do this absolutely invali-
dates a contract where as in this case there can be no
question of the validity of the arrangement otherwise.
As bearing upon the merits of the contribution we are
not to assume that the commissioners have acted reck-
lessly or even ignorantly, although there had been no
statutory valuation.   They doubtless had a fairly accu-
rate idea of the value of the real estate being exchanged
and what the balance would be, and so far as concerned
the expenses toward which they were contributing, the

statute required that before any contract was made detailed plans of the work to be done should be prepared and wherefrom it could be easily computed that in this case the expenses of such work would be far in excess of the amount to be paid by the city. Therefore, under these exact circumstances, I am not disposed to hold that the provision was unlawful.

It is complained that the contract is illegal both because of what it does provide and what it does not provide in respect of Liberty street and what is known as the Clark and Skinner canal. These public places adjoin each other and their southern termini are at the Buffalo river within that portion of Front street which is to be closed, Liberty street extending northerly beyond Ohio street and the Clark and Skinner canal extending northerly to the southerly boundary of said street. It is agreed that each of these shall be closed, provision being made for the exchange between the city and the companies of the lands covered by the Clark and Skinner canal owned by the former and other premises with improvements to be transferred by the companies and to which reference will be made.

The complaint in respect of the provisions relating to Liberty street is that they fail to provide for compensation to be paid by the companies to the city for the fee of the street. There is no provision for any conveyance of said fee by the city to the companies and I doubt if the city is the owner of such fee. Prior to proceedings under the Terminal Act and independent of its provisions a conveyance had been made by the city to the companies of any rights which it might have in the fee of Liberty street north of Ohio street. The present contract providing for conveyance on exchange by the city of that portion of Ohio street to be closed includes the intersecting portion of Liberty street within the bounds of Ohio street. It was found by the trial court that title to the fee south of Ohio street and north of " Big Buffalo

creek or Front street " became vested in 1845 in one Austin and that this fee was never taken from him or his heirs by condemnation proceedings and that he never released the same to the city of Buffalo or the state of New York. While there have been various conveyances by the city of Buffalo and legislation by the state of New York purporting to affect said southerly portion of Liberty street, counsel for plaintiff does not claim that either ever acquired title thereto by conveyance or condemnation proceedings but bases his present claim of title in the city to the fee thereof upon adverse possession. There are no findings or requests to find that as a matter of fact such title was ever thus acquired in such manner and that would seem to be a sufficient answer to this contention.

But there is still another answer in so far as it is urged that the contract should be declared invalid because of the failure to provide for compensation by the railroad companies for the fee of this street, even assuming that it belongs to the city. As I have said, there is no provision for any conveyance of this fee to the companies. If the land belongs to the city then it will simply be necessary that ordinary condemnation proceedings or proceedings for appraisal under the Terminal Act shall be had to ascertain the payment to be made by the companies to the city for such lands. The necessity for such step would simply require proceedings supplementary to the present contract and the absence of provision in the contract therefor would not so affect the scope, substance and consideration of the provisions which are made as to invalidate them.

The Clark and Skinner canal is employed by the city as a berth for a fire boat, its use for ordinary canal purposes having long since been abandoned. It is equipped with appropriate docks for its present use, and on the adjacent portion of Liberty street there has been constructed by the city a large building for the accommodation of the crew

of the fire boat. The plans which have been adopted by the commission contemplate that in the future use and development of the terminal facilities being provided for, tracks shall be constructed across this canal, and, as already stated, it is within that portion of Front street which is closed. The contract by quite elaborate clauses provides that this property shall be conveyed by the city to the companies at a valuation to be fixed as provided in the Terminal Act, and that the companies shall acquire and convey to the city a tract of land a short distance easterly of the one in question, which shall be used for the purposes for which the Clark and Skinner canal had been used, and at their own expense shall construct thereon a fire berth and move thereto the building for the accommodation of the fire crew now resting on Liberty street, and move, or pay the city of Buffalo the expense of moving, fire intakes, the value of the premises exclusive of improvements being duly fixed by appraisal, and the companies further agreeing that they will waive any claim against the city for any excess of valuation of the premises by them to be conveyed over the value of the premises to be by it conveyed.

I do not find it to be argued that there is anything in the terms of these provisions which is unfair to the city or any question to be raised but that properly and in good faith provision is being made for the construction and equipment of a berth for the municipal fire boat in the place of the one which is to be closed at the Clark and Skinner canal. The contention is that this entire arrangement is utterly beyond the authority and power of the Terminal Commission and void and that it is such an integral part of the entire contract that the whole structure must fall with it. It does not seem to me that it is thus invalid.

The entire plan as adopted by the Terminal Commissioners required the closing of the slip for the fire boat and of Liberty street whereon rested certain buildings to be

used in connection therewith. This was a closing and change of location of a public street and of a public place and the act which has already been quoted explicitly provided that the commissioners might agree "with any company for the change of location * * * of any street, alley or public place which may be necessary," and also authorized them "to acquire any lands in the City of Buffalo, to close or alter any street * * * or public place, to change in or remove from any such street, alley or public place any gas or water pipes, sewers, conduits or other objects * * * which they shall decide shall be necessary for the purpose of carrying out the plans and contracts hereby authorized." It seems to me that these provisions in connection with those providing for exchange of lands amply authorized the commissioners in behalf of the city to change the location of the berth for the fire boat and acquire a new one, and that it might either do this through selling the Clark and Skinner canal to the companies for cash and using that cash with which to accomplish the transfer or might do it as it did through exchange of lands with the railroad company on an appraisal duly made as provided by the statute.

The same provisions of this statute and the same general course of reasoning in my opinion answer the objections made by the appellant to the clauses in the contract for the acquisition by exchange with the railroad companies of the piece of land situate at the southwest angle formed by the intersection of Main street with the Buffalo river.

Washington street was the street next east of and parallel with Main street running to the Buffalo river, and as has already been stated the plan which has been adopted properly and necessarily as found by the court calls for the closing of the southerly end of this street. There were located at this end intakes for fire purposes, and the use of these intakes would at times require that the fire boat should be there stationed. By the acquisition of the

piece of land in question the city acquires a frontage on the river of 200 feet, and in view of the plaintiff's arguments in connection with the closing of Front street this acquisition should be an advantage rather than objectionable. In addition the companies agree at their own expense to remove the fire intakes from the foot of Washington street and relocate them on the land thus to be acquired as aforesaid and thence to connect them with the intakes in Washington street above or northerly of the portion of that street which is closed. Thus we have it that the city by exchange acquires a piece of land to take the place of the portion of a street which is closed and secures such a relocation and readjustment of its facilities for fire protection as obviate any disadvantage arising from the closing of the street which has been deemed necessary.

Objection is made because the contract allows one track still to cross Main street at grade and another on a viaduct and allows the construction west of Main street of a short extension of a track already there and for a short distance of an additional track and which produces an additional street crossing at grade. The objections to all of these various features will be considered together.

In the first place, it is urged in substance that a contract which fails to eliminate all the crossings on one street and actually increases the number of tracks at grade on another street has necessarily failed in its purpose and must be unlawful. This argument as applied to the facts before us seems to be entirely without foundation.

The plan adopted by the contract must be considered as a whole, and when this is done it is seen that viewed simply from the standpoint of eliminating grade crossings it is not subject to objections of the character which are made. Main street is the important street, and prior to the contract was crossed by five tracks at grade. By the arrangement in question four of these crossings have been eliminated and the remaining one is maintained for restricted purposes. It has been found by the court that the preserva-

tion of this track and the construction of the additional pieces of track west of Main street are necessary and proper in order to carry out the plan which results in the elimination of the crossings as aforesaid.    It is said that plans presented by the plaintiff proposed a similar arrangement of tracks.

But further, it must be kept in mind that the purpose of the present act is not only to secure the elimination of grade crossings but also to secure the extension of terminal facilities and conveniences and, therefore, the commissioners were entitled to take into account that result in making the contract which they did.

In the second place, it is urged that the contract permitting the additional pieces of track to be laid in Water street violates the provision of the Constitution (Art. 3, section 18) that "The Legislature shall not pass a private or local bill   *   *   *   Granting to any corporation, association or individual the right to lay down railroad tracks," and also the provision of the Railroad Law (Cons. Laws, ch. 49, section 21) that "No railroad corporation shall   *   *   *   construct its road in, upon or across any street of any city without the assent of the corporation of such city."    I do not think that either of these claims is well founded.    The Constitution was intended to prohibit the enactment of special legislation which had for its primary and fundamental purpose the grant of privileges to construct and maintain railroads and tracks, and to compel the acquisition of such rights under general and uniform statutes.    The legislature in accordance with the command of this constitutional provision has adopted the general statute for the organization of railroad corporations and the location and alteration of routes whereon may be constructed their tracks, and just as such Constitution prohibits special legislation, so the statute provides by general enactment for the original location of a route or for a substantial alteration thereof.    Those enactments do not fit this situation,

which is neither the location nor alteration of a route, and I should not think that it was intended to prohibit a municipality from granting to a railroad company the right to lay in a street where its tracks were already located a short switch or siding which might be necessary for the convenience of those who were transacting business with the railroad. But however this may be, it seems to me clear that the Constitution was not intended to prohibit legislation enabling a municipality to eliminate grade crossings and secure better terminal facilities, and as a means and incident to this end compel the rearrangement of tracks even though such rearrangement did result in laying a short piece of new track in a street already occupied, in the place of other tracks removed at a nearby point. (*Matter of Gilbert El. Ry. Co.*, 70 N. Y. 361, 369.)

Neither do I think that the section of the Railroad Law which has been quoted prevented the provisions which have been made by the commissioners. The statute simply requires that consent should be given by the corporation and not by any particular body thereof, and it seems to me that the same legislative power which adopted this provision had ample power to authorize a commission which included three of the standing officials of the municipality to make an agreement in its behalf to such relocation of tracks as has been made in carrying out the main purpose of the statute. For many years a grade crossing commission has been engaged in the elimination of grade crossings in Buffalo. By the statute creating that commission the latter is expressly authorized in behalf of the city to make contracts with the railroad companies, and so far as I am aware no one has seriously questioned that the legislature might thus authorize this commission in behalf of the city to make contracts which undoubtedly required in some form municipal consent to their execution.

Complaint is made because the contract provides that

the various streets which are to be closed are closed, discontinued and abandoned as of the date of the execution of the contract, and it is said that the result of this will be to deprive abutting owners of their easements therein before compensation is awarded to them for the loss thereof and hence a violation of the Constitution. While the contract does provide for the closing and abandonment of the streets, this fairly refers, I think, to the termination of public easements therein and does not mean that the defendants may take physical possession thereof and destroy private easements therein until proper provision has been made for compensation. (*Matter of Mayor, etc., of N. Y.*, 28 App. Div. 143, 151; affd., 157 N. Y. 409; *Holloway* v. *Southmayd*, 139 N. Y. 390, 410.)

If the defendant companies should attempt to pursue any different course we have no doubt that the property owners would be able to find ample means of legally protecting their rights.

It is provided in the contract that "If, for any reason, at any time, within a period of fifteen (15) years from the date of the execution of this contract, said company, or its successors, shall cease to maintain, occupy or use its passenger depot at the place herein designated at which the same shall be built, by reason of its voluntary act, then and in that event said company shall forfeit its right, title and interest in and shall reconvey to the said city of Buffalo all of the lands herein referred to and described to be conveyed by said commission to said company." It is argued from this provision that the defendant companies may at any time abandon their proposed new station and suffer as the only penalty for so doing the loss of lands conveyed to them, retaining any and all other benefits secured by them under the present contract.

This provision must be read in connection with a prior one whereby "The company agrees at all times within a period of fifteen (15) years from the date of the execution of this contract, to move and bring into and

from the passenger station proposed to be constructed by it hereunder, all regular passenger trains operated by it within the city of Buffalo." By these two clauses thus read together the company agrees to use said passenger station for all of its regular trains for a period of fifteen years, and the city of Buffalo would have the right to utilize all legal methods to prevent it from voluntarily abandoning such use during said period. Beyond this, however, it is to be borne in mind that this entire contract is by the provisions of the statute made subject to the act establishing a public service commission, and, therefore, the city must take its chances on any compulsory proceedings by said commission affecting the use of said station within said period, and, on the other hand, the companies cannot after that period make any change without the consent and approval of said commission. It is not to be believed that said commission will ever permit any change in the location or use of said passenger station by said companies which, after a full hearing, is not deemed to be in the interests of the city of Buffalo, and we think that this is a very practical and far-reaching safeguard against any attempt by the companies to take advantage of the city under these clauses.

I think that the judgment appealed from should be affirmed, with one bill of costs to respondents.

In view of the conclusions reached by us upon the merits, and of the fact that all the issues argued by the city are also presented by the plaintiff, the question whether the corporation counsel has the right to prosecute this appeal in behalf of the city is of no practical importance, and, therefore, the motion to dismiss the appeal taken by him in behalf of the city should be denied.

Willard Bartlett, Ch. J: (dissenting). I dissent on the ground that some of the essential features of the contract in question involve the appropriation of the money or other property of the city of Buffalo to

objects other than city purposes.   It was conceded in the prevailing opinion in *People ex rel. Simon* v. *Bradley* (207 N. Y. 592, 611) that if the act creating the terminal commission permitted such appropriation it would be unconstitutional.   When that case was decided I was one of those who deemed the statute objectionable in this respect, and I think the contract which has now been made thereunder demonstrates the validity of the principal objection then presented in the dissenting opinion of Chief Judge CULLEN.

The contribution by the city of the $98,000 excess awarded in the appraisal proceeding for the exchange of lands can only be justified upon the assumption that this amount represents a portion of the expenses necessarily and properly involved in the elimination of grade crossings, and I am not convinced that such is the fact.

I find no authority conferred upon the terminal commission to acquire the triangular parcel of land on the Buffalo river for which the city pays by the conveyance of other lands.   In *People ex rel. Simon* v. *Bradley* (*supra*) Judge CHASE said that nowhere in the Terminal Act was there any express requirement that the commissioners should or might acquire real property for any purpose except in connection with the work of eliminating grade crossings, and that authority to acquire real property for any other purpose should not be inferred. According to the trial court this triangular parcel is to be acquired for the relocation of fire mains; according to the terminal commission its acquisition is intended to give the city of Buffalo a dock frontage of 200 feet on Buffalo river.   Neither purpose has any real relation to the elimination of grade crossings.

Although one of the express objects of the Terminal Act was to secure to the public freedom from the obstruction of the streets of the city of Buffalo by railroads, we find that the contract provides for laying tracks in a street where none now exist.   I think that this provision

11

is wholly unauthorized, and in plain violation of the spirit and intent of the act.

I have mentioned only a few obvious objections to the validity of the contract. There are others equally serious. Reading and considering it as a whole, it seems to me that its authors, actuated doubtless by a desire to promote what they regard as the public welfare, have gone beyond their powers under the Constitution and the Terminal Act as heretofore construed by this court.

CHASE, HOGAN, CARDOZO and POUND, JJ., concur with HISCOCK, J.; WILLARD BARTLETT, Ch. J., reads dissenting memorandum, and SEABURY, J., concurs.

Judgment affirmed.