KEMP v. UNITED STATES.
No. 903 Civil.

District Court, D. Maryland.
April 29, 1941.

Paul F. Due and Joseph P. Martin, both of Baltimore, Md., for plaintiff.

Bernard J. Flynn, U. S. Atty., and T. Barton Harrington, Asst. U. S. Atty., both of Baltimore, Md., for defendant.

WILLIAM C. COLEMAN, District Judge.

This is a suit under the Tucker Act, 28 U.S.C.A. § 41(20), in which the plaintiff claims certain sums due him on account of contracts awarded to him to supply the Post Office and War Departments with certain equipment. A stipulation entered into and filed in the case removes from controversy a good deal of what might otherwise become rather complicated accounting questions.

Plaintiff claims approximately $9,000 with interest. In addition to its denial of a major part of this indebtedness, the Government has set up counterclaims alleging that the plaintiff owes it more than $9,000.

In so far as the claim with respect to the contracts with the Post Office Department is concerned, with the exception of one item relating to a lathe, the parties are not far apart. In fact, plaintiff has agreed, in the course of the trial, to accept a figure admitted by the Government, pursuant to the stipulation, to be due with respect to these various other contracts, namely, $1,279.58. Also, it is stipulated that the Government owes the plaintiff $8,149.41 on certain contracts with the War Department. So the controversy, thus abbreviated, involves only two matters: First, a contract for delivery of a lathe by the plaintiff to the Post Office Department; and, secondly, a contract for delivery by the plaintiff to the War Department of a motor-driven drilling machine for use at the Pickatinny Arsenal, Dover, New Jersey.

As to the first item, the Government contends that although the lathe was delivered, it was not up to specifications, both as respects the machine proper and its mode of operation, and also with respect to various accessories embraced in the contract. Representatives of the Post Office Department have testified that, to their personal knowledge, as a result of operating the machine, it fell far short of the specifications. The plaintiff on his part has denied this, but his testimony is not as convincing as that of the Government representatives. We are therefore disposed to accept the Government's contention as correct. The machine was rejected and returned. Plaintiff has testified· that he believes it does meet the specifications except, possibly, with respect to some of the accessories. But the Government in a contract of this kind has a right to treat the machine and the accessories as a unit, and if the specifications are in fact not met with respect to any part of the contract, the Government has a right to reject the entire order. So, taking the figure of $1,279.58, agreed as being due the plaintiff on other Post Office contracts, and deducting therefrom the stipulated value of this lathe, $810.77, there is left a balance of $468.81, to which we find the plaintiff is entitled.

Turning now to the other and the major item in controversy, namely, the drilling machine, the material facts surrounding this item are as follows: In response to Government invitation, the plaintiff and two other parties submitted bids for the furnishing of a motor-driven drilling machine to the War Department's Pickatinny Arsenal, Dover, New Jersey, within one hundred and sixty days from date of the contract. The plaintiff's bid being the lowest, namely, $2,953.65, the award was made to it. Formal contracts were forwarded for signature by the plaintiff, which were signed and returned. The amounts of the two other bids received were $10,112 (from the Henry Prentiss Company, Inc. of New York City), and $12,133 (from the Kingsbury Machine Tool Corporation, of Keene, New Hampshire).

The plaintiff, not being a manufacturer of this type of machinery, placed an order for the machine with the W. K. Millholland Machinery Company of Indianapolis, Indiana, and not being familiar with either the specifications or the value of such a machine, accepted, without question, the price quoted by the Millholland Company, and incorporated it in the bid filed with the Government. Two days after signing the contracts and forwarding them to the Government, but before the Government had executed them, the plaintiff was notified by the Millholland Company that it had made an error in quoting its price on the machine to the plaintiff, namely, that the manufacturer's price should have been $20,813 instead of $2,813, due entirely to an inadvertent typographical error in leaving out one naught, or cipher. Three days later the plaintiff relayed this information to the

Government, and asked to be relieved of the contract, the manufacturer having returned the order and requested cancellation. The Government replied that pending receipt of complete details respecting the alleged error, the contract was "suspended." Thereupon, a good deal of correspondence passed between the Government and the plaintiff. Additional information was obtained by plaintiff from the Millholland Company, at the request of the Government, and submitted to it with respect to the price quotation and surrounding circumstances. Disclosure by the Government was also made to plaintiff, at his request, of the great disparity between his bid and those of the other bidders. Nevertheless, the Government insisted upon the contract being carried out according to its literal terms, or being paid any damages resulting from the plaintiff's failure to do so.

The matter dragged on until September, 1939, when the Government notified the plaintiff that unless it received word from him within five days that he was proceeding to fulfill the contract as written, the Government would place an order for the machine with the next lowest bidder and would charge him with the difference in cost. Plaintiff did not reply to this communication, giving at the trial as a reason for not doing so, the fact that he had put the matter squarely up to the Millholland Company for its decision, since its error was the cause of the controversy, and that he had not yet had a definite reply from that company. Thereupon, the Government relet the contract, notified the plaintiff that his contract was canceled, and on January 13, 1941, he was notified by the Comptroller General's Office that he was liable to the Government in the sum of $9,338.85, $9,208.89 of which represented excess of the price of the Kingsbury machine over the plaintiff's bid as originally made, and the balance, $129.96, representing liquidated damages due to alleged delay in securing delivery of a machine.

It appears from the testimony in the case that the machines under the two other bids which, as previously explained, were in the approximate amounts of $10,000 and $12,000, had respectively a production of approximately only 25 per cent and 50 per cent of the plaintiff's machine. Furthermore, General, then Colonel, Shinkle, of the Ordnance Department, in command of Pickatinny Arsenal, admitted that he thought the result of holding the plaintiff to the contract would be unfair. Also, in the course of the controversy, he wrote to the Chief of Ordnance, War Department, that "the Millholland machine is worth a great deal more than the price at which it was offered."

Summarized, the contention of the Government is that the bid submitted by the plaintiff was intended as the bid for consideration; that the disclosure of the error in the price was not made until after the contract had been signed; that in view of the fact that the contract had been awarded and entered into, the War Department, according to an opinion rendered to it by the Comptroller-General, was without authority to cancel the contract, and that, therefore, if any relief was to be afforded plaintiff, it should be based upon a claim submitted by the plaintiff after he had gone through with the terms of his contract, to the General Accounting Office of the Government.

With this contention of the Government we are totally unable to agree. All of the facts, including the admissions of the Government, indicate that to adopt the Government's theory would be unconscionable. There is no basis for estoppel. It is true that private individuals or corporations, when contracting with the Government, are held to more strict requirements than is usually the case with respect to private contracts. These requirements obtain the force of law by reason of regulations of the various executive departments of the Government, passed pursuant to statute. But we know of no principle of the law of contracts, and have been cited to no case, which supports the Government's contention upon a state of facts such as are here presented. It is axiomatic that the Government must be held to the same general principles of equity and fair play in dealing with those who contract with it as are the contractors themselves. The contention here made by the Government, however, flies directly in the face of that principle. If carried out logically, by the Government's contention there would seem to be no case in which reformation of an inadvertent, palpable error could be corrected. Indeed it would appear that if the discrepancy had been hundreds of thousands of dollars, instead of eighteen thousand dollars—which under the circumstances was a very great discrepancy—the position of the Government, to be consistent, would have to be the same. The Court is aware of the fact that in reply the Government witnesses and counsel

say, in effect: "No, not exactly, because in such an extreme case the error or discrepancy would be so palpable that the Government would be put on notice", but we have ample evidence that the Government in the present case knew—that it was bound to know—from the very figures themselves, that there must have been an inadvertent error. The army officer in charge admitted that the Government was obviously getting something for nothing. He said he was struck by the great discrepancy, and has summarized his attitude by admitting that to hold the plaintiff would be unfair.

It is interesting to consider what would have been the attitude of the Government had the shoe been on the other foot, and the Government had made a typographical error in the contract or in payment under it. The Court cannot refrain from the observation that it is just this sort of arbitrary attitude by Governmental departments and their officials that is calculated to destroy confidence on the part of our citizens and taxpayers in the conduct of our Government. It is calculated to undermine proper respect for the Government, while encouragement of such respect, in accordance with the proper principles of law, is one of the prime duties of the Federal Courts.

Lest this decision be unduly protracted, suffice it to repeat finally that we know of no principle of contract law announced in any decision of the Supreme Court, of other federal courts, or of the highest State courts, which supports the Government's contention. The present plaintiff testified that he had made thousands of bids or quotations for Government work. This case presents a typical illustration of the old adage of the army, "passing the buck." General Shinkle's testimony was commendable for its frankness, but shorn of all extraneous matter it comes down to this: Although he thought it was unfair to hold the plaintiff under this contract, he or the War Department would get in trouble if it did not do it, i. e. that the War Department had no discretion in the matter, and, therefore, he saw nothing else to do but to pass the responsibility for making a decision to the Comptroller-General's Office. But fair play demanded that he communicate with the plaintiff forthwith, so that a perfectly obvious error might be corrected. After the matter got into the Comptroller General's Office, an opinion was rendered which the Court has very carefully considered, including the authorities cited therein, but we fail to find any support in those authorities for the conclusion reached by the Comptroller-General.

We quote the following from that opinion: "There is nothing on the face of the bid of the Kemp Machinery Company to indicate that the amount thereof is other than that intended by the bidder. In fact, it appears that there was no mistake in the bid submitted. In other words, the bid was exactly as intended by the contracting officer and there was no misunderstanding on the part of either party to the contract as to the equipment to be furnished or the price to be paid therefor. The fact that the contractor relied in the preparation of its bid on a quotation furnished by its suppliers, which quotation later proved to be erroneous, is not sufficient to authorize relief from the obligations of the contract voluntarily entered into with the Government."

That statement seems to us to fly directly in the face of Supreme Court decisions, which must control in the present situation. The principle of Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, does not apply, because, as stated in that decision, in matters governed by the Federal Constitution, or by Acts of Congress, the law to be applied is not the law of the State, and while no one specific Act of Congress is directly involved in the present case in the sense that its interpretation is involved, the contract is based upon the authority given to the War Department by statute. But even if we assume that the law of New Jersey, where the plaintiff signed the contract, governs, we have not been referred to any New Jersey decision, or to any State court decision, which goes contrary to the decisions of the Supreme Court to which we will now refer. Indeed the law of New Jersey appears to be in entire harmony with the conclusion we reach. See Barlow v. Jones, N.J.Ch., 87 A. 649.

Of course, notwithstanding informality of execution of a contract on the part of the Government, even though there may be statutory requirements for formality, if the other contracting party has actually signed or entered into the agreement he can be held to performance. See United States v. New York & Porto Rico Steamship Company, 239 U.S. 88, 36 S.Ct. 41, 60 L.Ed. 161. But that is not the question presented in the present case. In Moffett, Hodgkins & Clarke Co. v. Rochester, 178

U.S. 373, 20 S.Ct. 957, 44 L.Ed. 1108, the City of Rochester invited proposals from contractors for two separate contracts for work to be done for the improvement of its waterworks, and the petitioner, the Moffett Company, put in bids. Owing to various causes, some serious mistakes were made in the figures in its bids, whereby the compensation that it would have received if its bids had been accepted and the work performed by it would have been diminished many thousand dollars. The Moffett Company bids were the first opened, and as they were read that bidder's engineer noticed the errors, called attention to them and stated what the figures were intended to be and should be. There was a statute in New York which provided that neither the principal nor sureties on any bid or bond had the right to withdraw or cancel the same until the board had let the contract for which the bid was made, and until such contract had been duly executed. The city government rejected one of the Moffett Company bids but accepted the other and called for its performance at the price stated in the bid. The company declined to enter into a contract for the performance of the work at that price; and, claiming that the city threatened to enforce the bond given with the proposals, brought suit praying for a reformation of the proposals to conform to the asserted intention in making them and their execution as reformed, or their rescission.

While that case is not exactly on all fours with the present case, because there the transaction had not reached the degree of a contract, we refer to it primarily for the following language in the opinion of the Court, taken from the lower court, as follows (178 U.S. page 386, 20 S.Ct. page 961, 44 L.Ed. 1108): " 'The complainant is not endeavoring "to withdraw or cancel a bid or bond." The bill proceeds upon the theory that the bid upon which the defendants acted was not the complainant's bid; that the complainant was no more responsible for it than if it had been the result of agraphia or the mistake of a copyist or printer. In other words, that the proposal read at the meeting of the board was one which the complainant never intended to make, and that the minds of the parties never met upon a contract based thereon. If the defendants are correct in their contention there is absolutely no redress for a bidder for public work, no matter how aggravated or palpable his blunder. The moment his proposal is opened by the executive board he is held as in a grasp of steel. There is no remedy, no escape. If, through error of his clerk, he has agreed to do work worth $1,000,000 for $10 he must be held to the strict letter of his contract, while equity stands by with folded hands and sees him driven into bankruptcy. The defendants' position admits of no compromise, no exception, no middle ground.' " Then the Supreme Court continued as follows (178 U.S. page 386, 20 S.Ct. page 961, 44 L.Ed. 1108): "These remarks are so apposite and just it is difficult to add to them. The transactions had not reached the degree of a contract,—a proposal and acceptance. Nor was the bid withdrawn or canceled against the provision of the charter. A clerical error was discovered in it and declared, and no question of the error was then made or of the good faith of complainant."

Let us consider whether the rule is different if, as we must assume in the present case, the plaintiff, except for his right—if he had a right—to have the contract reformed, would have been bound by his having executed the contract. We believe that the fact that the relations between the parties had not advanced in the Moffett Company case to the stage that it had advanced in the present case, i. e. to the point where the contractor had become bound by his execution of the contract, makes no difference when we are dealing with the question of a palpable error brought to the attention of the other party to the contract. And so it was decided in Ackerlind v. United States, 240 U.S. 531, 36 S.Ct. 438, 60 L.Ed. 783, where it was held that notwithstanding statutory requirements that contracts made by the Secretaries of War, of the Navy and of the Interior, be reduced to writing and signed by the contracting parties, reformation of a contract so executed may be required in a proper case as against the United States, as it may be required notwithstanding the provisions of the Statute of Frauds; and that the failure of a contractor to read before signing a contract the terms of which he had previously seen in print is not enough to debar him from seeking relief by having it properly reformed.

The Court of Claims has taken the same position which this Court now adopts, in a recent case, Alta Electric & Mechanical Co., Inc. v. United States, 90 Ct.Cl. 466, upon a state of facts strikingly like those before us. There a contractor, in response to an invitation by the Bureau of Yards

and Docks of the Navy Department, submitted a bid for furnishing certain materials and performing certain work at the Mare Island Navy Yard, and after the bid was opened but before it was formally accepted, the contractor discovered that it had made an erroneous calculation, based on the misunderstanding of a sub-contractor's proposal and price. The contractor thereupon requested that it be permitted to withdraw its bid because of error, but such permission was refused by the Government. Thereafter the contractor declined either to enter into a contract, or to furnish the material and perform the work covered by the bid. The Court of Claims held that the action of the Comptroller General in withholding from plaintiff, out of moneys due it under another subsequent contract, the difference between the contractor's bid on the Mare Island project and the next lowest bid was illegal. It was held that the plaintiff had the right to withdraw its bid, and having had this right, could not be penalized because of its refusal to sign the contract, or to perform the work, or to furnish the material contemplated by the bid.

In the case just referred to there is a factual difference in that the contract had not yet been signed by the contractor. However, the bid had been opened, and by the Government regulations relied· upon by Government counsel in the present suit, after that is done there can be no withdrawal of the bid. So we have just as binding a situation under the Government's theory in the one case as in the other. Furthermore, in the case just referred to, it is to be noted that the attention of the Government was not called by the contractors to the inadvertent error until after the bids had been opened.

The following quotation from the Alta case seems to be directly pertinent to the present issue (page 476 of 90 Ct.Cl.):

"Even if the plaintiff had not expressly called the error in the bid to the defendant's attention prior to its acceptance, the defendant should have suspected the existence of the mistake. Three bidders other than plaintiff submitted bids. These bids ranged from $25,950 submitted by plaintiff, to $31,700, $32,600 and $33,978 submitted, respectively, by the other three. When it is considered that three out of the four bids made fall within a range of $2,300 on a $32,000 job, and the fourth bid submitted is $5,750 lower than the lowest bid of the other three bids, the conclusion is obvious that the low bidder must have made an error in his computation.

"Upon the facts shown we are of the opinion that plaintiff should have been permitted by the defendant to withdraw its bid without penalty, and because of such permission being refused by the defendant plaintiff was justified in its refusal to sign the contract, or to perform the work, or furnish the material contemplated in its bid. * * *"

The Court quotes at length from and relies upon the Moffett Company case to which extended reference has already been made.

In Williston on Contracts, Section 1578, the law is succinctly summarized as follows: "The expressions are numerous that mistake in order to justify relief must be mutual, or that error of one party must be known to the other. That this is true of reformation is nowhere doubted; but some cases afford countenance for the doctrine that unilateral mistake, while the contract is still executory, and the parties can be put in statu quo, may afford ground for rescission, and doubtless the discretionary remedy of specific performance may be denied. Rescission has been most frequently sought where a price was bid which, because of erroneous arithmetical processes or by omission of items, was based on a mistake. Relief has been allowed in several cases of this and other kinds though denied in others. *In some of them, at least, it would seem that the party not in error should have suspected the existence of a mistake, in which case clearly rescission and restitution should be allowed.*" (Italics inserted). In support of the latter statement, Mr. Williston cites the Moffett Company case, supra, and also State decisions which, however, we do not consider it necessary to analyze.

The Restatement of the Law of Contracts, Volume 2, Section 503, page 967, illustrates what we understand to be the applicable principle as follows: "A, in answer to an advertisement of B for bids for the construction of a building according to stated specifications, sent B a bid of $50,-000. B accepts the bid. A, in the calculations that he makes prior to submitting his bid, fails to take into account an item of construction that will cost $5,000. If B knows, or because of the amount of the

bid or otherwise has reason to know that A is acting under a mistake, the contract is voidable by A; otherwise not."

It follows, therefore, from the conclusions here reached that the Government's counterclaim on this item is completely without merit, and so cannot be allowed. Accordingly the judgment of this Court is for the plaintiff in the total sum of $8,618.22, namely, the stipulated amount due plaintiff on the other War Department contracts, plus the balance we have found to be due the plaintiff on Post Office Department contracts, i. e. $468.81. No interest is allowable. Smyth v. United States, 302 U.S. 329, 353, 58 S.Ct. 248, 82 L.Ed. 294, 114 A.L.R. 807; and it is to be noted that no deduction is being made on account of the Government's so-called cash discount, because such is claimed on the erroneous theory that it is to be treated as having paid for various pieces of equipment that were delivered, merely by off-setting their cost against its counterclaims.