STATE OF CONNECTICUT v. F. H.
McGRAW & CO., Inc., et al.

No. 140 Civil.

District Court, D. Connecticut.

Oct. 18, 1941.

Leo V. Gaffney, Asst. Atty. Gen., of Hartford, Conn. (Francis A. Pallotti, Atty. Gen., of Hartford, Conn., on the brief), for plaintiff.

Joseph Lotterman, of New York City, and James W. Cooper, of New Haven, Conn. (Watrous, Gumbart & Corbin, of New Haven, Conn., and Lotterman & Tepper, of New York City, on the brief), for defendant F. H. McGraw & Co., Inc.

Joseph F. Berry, of Hartford, Conn., (Day, Berry & Howard, of Hartford, Conn., on the brief), for defendant Aetna Casualty & Surety Co.

CLARK, Circuit Judge (sitting as District Judge pursuant to statutory designation).

This is an action by the State of Connecticut for damages on a bond given by F. H. McGraw & Company, Inc., as principal, and Aetna Casualty & Surety Company, as surety, as a condition of bidding on a contract for the construction of the substructure of a bridge over the Housatonic River between Milford and Stratford, Connecticut, as a part of the new Wilbur Cross Parkway. The first-named defendant—hereinafter termed "McGraw"—having been awarded the contract as the lowest bidder, declined to proceed with the work on the grounds that it had not bid upon the basis of the use of as much compressed air in underwater excavation as the State demanded, that its bid was therefore a qualified one or the result of a mistake, and that these circumstances were known to the State before the latter accepted the bid. It defends here on these grounds and also asks for relief by way of rescission of the contract. The Aetna Company, as surety, has cross-claimed against McGraw for reimbursement in the event judgment goes against it, and McGraw asks for an injunction against action by Aetna; but these issues, being dependent upon the outcome of the main controversy between the State and McGraw, were not taken up at the trial.

The paramount importance of the facts to a correct appraisal of this controversy is obvious. The State's advertisement for the job stated that $395,000 was available for this work, and the state engineers later said that they expected the cost to exceed $400,000. Six bids were received, the lowest of which was $339,980, made by McGraw. The next lowest was $410,682.50, made by the A. I. Savin Construction Company, which eventually did the work. The highest was $499,950.40. The engineers for the State noticed at once the unusual discrepancy in the McGraw bid, so much below even their own estimate of the expected cost, and so they sent for McGraw's local representative, Palmer, to explain this discrepancy.

As the parties realized at once, the difference in estimate and bid was due to the cost of constructing pier 8 of the substructure by the mandatory use of compressed air. Pier 8 was the most difficult pier to construct, mainly because of the depth of the water and partly because of the type of rock on which the foundation was to lie. In the construction of the pier, a contractor might build a cofferdam, pump out the water, and excavate in the open. It would also be possible to use a caisson with compressed air to keep the water out as the excavation became deeper, the caisson eventually to be filled with solid materials to form the pier. Both of these methods were known to the State. Mc-

Graw's contentions involve a third method, which it claims to be fully adequate, namely, the use of the wellpoint system. This comprises a cofferdam outside of an open caisson (or other inner structure) and a special set of pipes designed to dry up the area of excavation and thus accomplish the same result as the use of compressed air.

Hence when Mr. Weldon, engineer for the State, first saw Palmer—on December 15, 1938—he asked whether or not Mc-Graw intended to use air. Palmer said that he rather thought not, but was not sure, because he had not prepared the bid. Weldon thereupon requested Palmer to ask Mr. Strike, vice-president of McGraw and the man who had prepared the bid, to come to Hartford for a conference.

From this time on there is some disagreement as to the times when later events occurred. On the view here taken these exact dates are not important. It appears fairly clear from the documentary evidence in the case, however, that Strike arrived in Hartford on the following day, the 16th, and conferred with Weldon. At this time Strike definitely stated that he did not read the specifications to require the construction of pier 8 by use of a pneumatic caisson and compressed air, that his company had not bid on that basis, and that under no circumstances would his company undertake to construct the pier at a loss, which would certainly occur if air was thus used. Since the State had to start the work by January 1, 1939, in order to qualify for a P.W.A. grant, it was disposed to act quickly. At that time the state officials thought McGraw had ten days in which to accept; and because of the press of time, it seems to have been determined by at least some of them that McGraw might be permitted to withdraw on the theory that it had presented only a qualified bid. Permission was necessary because one of the conditions of bidding was that no bidder could withdraw his bid within forty-five days after the bids were opened. But Weldon learned that there might be some question whether the P. W.A. grant would be increased to match the second bid, if that was accepted forthwith; and it was then realized that the ten-day period usual in state contracts had been changed in this particular contract to five days, thus giving the State time to make a second award, if necessary, before January 1. Hence the state officials de-cided not to grant a withdrawal, but to let the five-day period expire, thus completely justifying the award of the contract to the second bidder. This course was followed, permission to withdraw was never given McGraw, and it was formally awarded the contract. McGraw had already telegraphed a withdrawal of the bid, and thereafter it definitely rejected the award. The contract was then given to the second bidder, and this action followed.

The two lines of defense noted above are so similar that they are practically two aspects of the same issue. They may be restated as these questions: (1) Was McGraw's bid an offer to construct the substructure without the use of a pneumatic caisson on pier 8? (2) Or did the State accept McGraw's offer with the knowledge that a serious mistake had been made in interpreting the specifications?

■ The argument that McGraw filed a qualified bid meets difficulties because of the language of the specifications and the requirement that offers could not be withdrawn within forty-five days of the opening of bids. Obviously a bid to construct the substructure for a bridge over another river for $200,000, for example, could hardly be accepted as an offer to construct the Housatonic bridge substructure; or a proviso written into the bid stating that the bidder would not be bound by a given specification could not be taken as an offer without the proviso. Here, however, McGraw's bid purported to conform to the specifications. The issue therefore really involves contrary interpretations of the specifications, rather than an offer differing from that called for. Otherwise the denial of the privilege to withdraw would be of little value. Once a person has purported to make an offer according to exact terms, that offer, if accepted, stands. Any dispute over terms would arise after the making of the contract, rather than as a bar to the existence of the contract itself.

■ The issue may be put another way. Actually no contract was ever signed by McGraw. This suit rests on the bid bond filed by McGraw, in which it was agreed that liquidated damages were to be paid for failure to execute a contract once the State accepted the offer. That is, it is upon a separate contract wherein McGraw promised to follow its bid by acceptance and performance of the construction con-

tract, if duly awarded it. The act of bidding was an offer to do the work according to specifications. This the State accepted, completing the engagement represented by the bid bond. If the State erred in demanding the use of air on pier 8, McGraw would be justified in not executing the contract, and would not violate the bid bond, because the performance demanded was not what was called for. On the other hand, if the State was correct in its interpretation, McGraw would have to do the job according to specifications.

It is necessary, therefore, to turn to the specifications in order to determine whether or not a bidder for the job was required to construct pier 8 by means of a pneumatic caisson. Disputed portions read:

"Foundations: The foundations for piers 8 and 9 shall be carried down to ledge rock; the foundations for the other piers shall be supported on steel bearing piles unless other instructions are issued by the Engineer. Whatever method is used by the Contractor for the construction of the foundations for piers 8 and 9, provision shall be made by him for a thorough inspection by the Engineer of the exposed surface of the rock in the dry.

"The Contractor shall include in his bid a sufficient sum to cover the cost of furnishing air on the foundation of pier 8. The plans have been prepared on the assumption that the Contractor will use the open dredged caisson, sunk to ledge rock, and then convert same to a pneumatic caisson to clean off the loose rock and deposit the foundation concrete under air.

"The plans for pier 9 have been prepared on the assumption that this pier can be constructed by the open coffer-dam method. However, the Contractor may use air on the construction of pier 9 if he so desires or elects, it being essential that, whatever method is used, provision shall be made that the ledge rock can be examined in the dry and that the foundation concrete can be deposited in the dry.

"Before any work is started the Contractor must submit for the Engineer's approval his methods of construction with design drawings, and in the case of piers 8 and 9, this method must provide for the removal of all material overlying the solid ledge and the placing of the concrete in such a way as to found these two piers solidly on the ledge."

Possibly the first paragraph alone above, or coupled with the word "assumption" of the second sentence of the second paragraph, might somewhat suggest an option to the contractor; but this is quite clearly negatived by the contrast between the express grant of such an option as to pier 9, and the direct command as to pier 8—"shall include." And the matter seems to be placed beyond dispute by long paragraphs following the above giving detailed requirements for the "open caisson for Pier No. 8," and for the pneumatic caisson into which it was to be converted. Here again detailed drawings. "showing the materials and details of construction he [the contractor] proposes to use" must be submitted and approved by the engineer before work is started; such materials and details "shall be as specified herein for the material or construction in question"; "provision shall be made for the attachment of air locks and the conversion to pneumatic caissons"; "as the bottom [of the caisson] approaches its final position the open caisson shall be converted into a pneumatic caisson in order that the foundations may be properly prepared and concrete placed in the dry"; "after conversion from an open caisson as described above, the caisson shall be sunk by the pneumatic process"; an air plant must be furnished with sufficient capacity to maintain the required pressure at the greatest depth to be reached, with air pipes, three air locks (two for material and one exclusively for men), and a hospital lock for emergency and an attendant experienced in the treatment of caisson disease; and so on. It does not seem possible to read all this other than as a requirement for the use at some stage of the work of a pneumatic caisson on pier 8; and hence an offer to construct pier 8 according to the specifications was an offer to do so in part by compressed air with a pneumatic caisson.

But this still leaves open the question of how much. All agree that, albeit expensive, it would not be a large part of the entire job on this pier, and McGraw's experts—the only ones offered in the case—regarded it as unnecessary anyhow. Savin, who completed the job, actually used compressed air for only one-fifth of this excavation, which would be 400 out of the total of 2,000 cubic yards. The point of conversion of the open to the pneumatic caisson was to be where "ledge rock" was

reached or as the bottom of the caisson "approaches its final position." The general intent that the pier should be founded "solidly on the ledge" and that the concrete be "placed in the dry" is clear. In view of this intent, coupled with the strong assertions of the experts that they did not consider air required to carry out this intent, I do not feel I should hold that this point of conversion is made so crystal-clear as to compel rejection of evidence of a genuine mistake by McGraw.

For Strike gave clear testimony of a bona fide error on his part in preparing the bid—error in that he honestly felt he could construct pier 8 within the specifications, employing the method he had in mind, and yet not use air to the extent expected by the State. In support of his testimony there was introduced a letter from E. J. Moore, vice-president of the Moretrench Corporation, manufacturers of wellpoint systems, which letter Strike had used as a basis for preparing his bid. This letter, accompanied by drawings, canvassed the possibility of using wellpoints for pier 8, and supported it as a feasible and workable method for this job. And the State conceded that Moore, who was present in court during the trial, would give testimony of its feasibility and that this testimony could not be controverted. But Strike testified further that, although he regarded it as unnecessary, he was determined to allow a safe margin in case the engineer should require an inspection of the foundation "in the dry." Hence, after consulting with an air expert, Mr. Benedict of Thomas Crimmins & Co., and obtaining an estimate therefor, he added to his figures an additional $11,000—beyond the $30,000 already allowed for the excavation—for the contingency that eventually he might have to use some air to satisfy the engineer and win the latter's final approval.

█ The fact that Strike considered the possibility of using some air leads the State to suggest that he had in mind the requirements and thus was not excused from going on with his bid. But this is to ignore both the definite notice served upon him by the State, after the disagreement was laid bare, that he must use the amount of air required by the State and must give written assurance to that effect in accepting the offer, and the fact that the state officials were not interested in his proposed plan and refused to hear him with respect to it. Approval by the state

engineer was a condition precedent, and this, it was made clear to him, he could not get for the plan on which he had prepared his bid. His mistake therefore comes to this, that he thought he had a plan which was so within the specifications as readily to secure the approval of the engineer. And on the evidence I am constrained to hold that this was by no means an unreasonable assumption on his part. That his mistake was bona fide is the purport of all the evidence pertaining to the surrounding circumstances. Furthermore, he would hardly have taken the risk of so large a loss or have passed on so big a bonanza to the State had he not been in earnest. And, as we have seen, this mistake was thoroughly known to the state officials before they accepted the bid.

The situation therefore appears to be fully within the rule of the leading Connecticut case of Geremia v. Boyarsky, 107 Conn. 387, 140 A. 749, 750 (followed in Home Owners' Loan Corp. v. Stevens, 120 Conn. 6, 179 A. 330; Cherkoss v. Gasser, 123 Conn. 368, 195 A. 737; and see 37 Yale L.J. 1152). In that case Geremia asked Boyarsky to make an offer for some carpentry and painting. In figuring on the job Boyarsky made an arithmetical error in adding the items, so that his bid was $1,450.40, instead of $2,210.40. Geremia, with good reason to know of the error, accepted the offer and subsequently refused to make any adjustment when Boyarsky notified him of the error. The Connecticut Supreme Court held that it was proper to cancel the contract while still executory. "The mistake of the defendants was of so fundamental a character that the minds of the parties did not meet. It was not, under the circumstances, the result of such culpable negligence as to bar the defendants of redress, and the plaintiff, before the contract was signed, had good reason to believe that a substantial error had been made, and, while the contract was still executory, and he had been in no way prejudiced, refused to permit the correction of the error, and attempted to take an unconscionable advantage of it. The defendants were clearly entitled to a decree canceling the contract."

█ This, therefore, appears to be an exact precedent for the case at bar. It is objected that the rule should be different where, as here, there is a proviso forbidding the withdrawal of bids. To be

sure, this puts a bidder on notice that there is a certain finality about bidding for a government contract. But this by no means should enable a governmental agency to take an unconscionable advantage of its special status as a government body. "It is axiomatic that the Government must be held to the same general principles of equity and fair play in dealing with those who contract with it as are the contractors themselves." Kemp v. United States, D.C.Md., 38 F.Supp. 568, 570. Furthermore, the court in the Geremia case cited with approval Moffett, Hodgkins & Clarke Co. v. City of Rochester, 178 U.S. 373, 20 S.Ct. 957, 44 L.Ed. 1108, a case in which the error was contained in a public contract bid not subject to withdrawal. There the Court answered the objection to cancellation where withdrawal was denied by quoting from the lower court's opinion, at page 386 of 178 U.S., at page 961 of 20 S.Ct., at page 1115 of 44 L.Ed.: " 'If the defendants are correct in their contention there is absolutely no redress for a bidder for public work, no matter how aggravated or palpable his blunder. The moment his proposal is opened by the executive board he is held as in a grasp of steel. There is no remedy, no escape.' " The proper effect of the requirement that bids remain unrevoked is to assure the State that a bidder will be relieved of his obligation only when it is legally justifiable. That means that the State is in the same position as any acceptor when there is a question of rectifying an error.

The only other distinction offered is that in the Geremia and Rochester cases the error was arithmetical, whereas here it is based on an incorrect reading of specifications in the light of the state engineer's requirements. The distinction seems artificial. In either event the bidder errs; in either event he is to a degree negligent. But in both, the offeree is aware of the error, and presses his advantage unfairly if he insists on the work at an inadequate price.

■ Of course, it is obvious, as the State contends, that the system of public bidding, developed by experience and usual in public contracts, should not be broken down by lightly permitting bidders to withdraw because of change of mind. Such a course would be unfair to other straightforward bidders, as well as disruptive of public business. But it can hardly be a substantial impairment of such system to grant the relief—which would clearly be given as between private citizens—in a case where a bona fide mistake is proven and was known to the State before acceptance or any loss to it.

■ Though Connecticut law must govern and is here followed, it would seem that the general result in this country is in accord, at least where the mistake is "palpable" to the offeree. See the excellent discussion and collection of cases in Lubell, Unilateral Palpable and Impalpable Mistake in Construction Contracts, 16 Minn.L.Rev. 137, 143; and compare Restatement, Contracts, § 503, Illustration 1; Williston on Contracts, § 1578. There are some cases substantially contra, which defendant cites. See Baltimore v. J. L. Robinson Const. Co., 123 Md. 660, 91 A. 682, L.R.A.1915A, 225, Ann.Cas.1916C, 425; Daddario v. Town of Milford, 296 Mass. 92, 5 N.E.2d 23, 107 A.L.R. 1447.

■ Hence the State's claim for damages must be denied as to both defendants, and McGraw is entitled to a decree that the contract is legally ineffective. Whether a formal decree of rescission is also necessary may perhaps be doubtful, although it seems that it may be had against the State, Reilly v. State, 119 Conn. 217, 219, 175 A. 582, 584, while costs may not be. State ex rel. Foote v. Bartholomew, 111 Conn. 427, 432, 150 A. 308. Presumably the result here reached will make further controversy between the two defendants unnecessary. If this is not the case, and further hearing on this aspect of the case is desired, request therefor should be presented in five days. Otherwise defendants should submit a form of judgment within that time, and plaintiff is allowed three days thereafter within which to present any objections it may have to the form submitted.