## UNITED STATES v. CITY OF NEW YORK.

District Court, S. D. New York.

June 2, 1942.

Samuel Brodsky and Frank J. Dufficy, Asst. U. S. Attys., both of New York City (Mathias F. Correa, U. S. Atty., of New York City, and Francis M. Shea, Asst. Atty. Gen., Sidney J. Kaplan, Sp. Asst. to Atty. Gen., and William S. Ward, Atty., Dept. of Justice, all of Washington, D. C., on the brief), for plaintiff.

Frederick P. Bryan, First Asst. Corp. Counsel, of New York City (William C. Chanler, Corp. Counsel, and George William Shea, George G. Gallantz, and Philip L. Wellens, Asst. Corp. Counsel, all of

New York City, on the brief), for defendant.

CLARK, Circuit Judge (acting as District Judge pursuant to statutory designation).

This action was brought by the United States against the City of New York for specific performance of an agreement for the disposition of the old post office and federal courthouse in City Hall Park. The United States asserts that it is to receive the sum of $4,354,907.61, plus interest from October 30, 1937;. and the city asserts that there is no agreement obligating it to pay the government, or if there is, that the agreement is invalid for several reasons. All the documents and other relevant material were offered by stipulation, and the facts can be determined from a consideration of these documents.

A general statement of the background of this controversy is necessary before the more critical facts are discussed. In 1867, the city conveyed the old post office site to the government for $500,000, subject to the condition that if it ceased to be used for either a post office or a courthouse the site should revert to the city. A building was erected by the government and used until October 30, 1937, when it was finally abandoned in accordance with a stipulation that if the government were unsuccessful in this suit it could reoccupy the site and erect a new post office or courthouse on it. After abandonment the building was torn down by the city at its own expense, and the site became part of City Hall Park.

The particular controversy here involved began to take shape about 1919, when the government found the building to be inadequate for its needs and started to look around·for a new site on which to erect a larger building. This search was concurred in and encouraged by city officials and civic organizations which considered the post office an eyesore and desired restoration of the park. Various committees, both official and unofficial, were organized to confer and to help select a site; and discussions were held over a long period of time. By 1928, considerable progress had been made and serious negotiations were undertaken.

In March, 1928, the Secretary of the Treasury inquired of the mayor whether or not the city would sell a site in the civic center for a proposed courthouse.

In September, the mayor replied that the Board of Estimate would agree to exchange such a site for the old post office site. To this the Secretary answered that the government needed to accommodate both the courts and the post office, and that it was willing. to buy the civic center site for a courthouse and exchange the old post office site for a second site suitable for a new post office building. This was countered by an offer from the mayor to convey the civic center site, plus some property on Church Street between Vesey and Fulton. Acceptance of this would have required acquisition by the government of further property at the Vesey Street site. The Secretary insisted that either one site suitable for both courts and post office, or two sites, had to be provided before· the old post office would be abandoned. There the matter rested for some time.

The next step in the negotiations was worked out by a committee of the Merchants' Association. It suggested that the United States acquire the Vesey Street site, that the city pay a proportionate share of the cost according to the size of the old post office and the new site, and that the government buy the civic center site. The approximations in this plan were that the Vesey Street site could be acquired for $5,000,000, that the city's share was $3,480,000, and that the civic center site might be sold for about $1,700,000. The mayor received the suggestion at a conference on January 15, 1930, and the Undersecretary of the Treasury received it in a letter from the Association dated February 17, 1930. On April 30, 1930, the Commissioner of Public Works of the city reported to the mayor that he had conferred with members of the Merchants' Association and that he recommended that the city pay $3,750,000 for the old post office site and sell the civic center site for $2,700,000. The assistant to the mayor conveyed this same proposition to the Undersecretary of the Treasury. In reply, the latter stated that $2,450,000 was the highest figure acceptable for the civic center site and that "favorable consideration" would be given to the "condemnation by the Federal Government of the Barclay, Vesey and West Broadway site under an agreement with the City of New York that its proportion of the cost of such site will bear the same relation to the total cost as the area of the Federal property bears to the total area of the Vesey Street block."

Several days later the Secretary wrote directly to the mayor stating the same thing.

On June 6, 1930, Mayor Walker wrote the first of four letters which, taken together, express the agreement as it was finally worked out. The mayor's letter, set out in the margin,[1] stated that the Secretary's letter just referred to had received "careful consideration by the members of the Board of Estimate and Apportionment in executive session." The mayor went on to say that $2,450,000 was a satisfactory price for the civic center site, that the city would pay $3,750,000 for the old post office site, or that the alternative of paying a proportionate share of the Vesey Street site was "agreeable to the members of the Board of Estimate and Apportionment." The second of the four letters is a reply, dated June 12, 1930, by the Secretary to the mayor's letter.[2]

[1] "My dear Mr. Secretary:

"Your letter of May 12, 1930, referring to the proposed disposition of the Federal Building in City Hall Park, received careful consideration by the members of the Board of Estimate and Apportionment in executive session, at their meeting today.

"It affords me great pleasure to be able to inform you that your suggestion that the valuation of approximately $2,450,000 for the city property in the Civic Center, as appraised by the Special Appraisals Committee of the Real Estate Board of New York, was acceptable to the members of the Board of Estimate and Apportionment.

"Therefore, I am now authorized to offer that the City of New York will pay the Federal Government the sum of $3,750,000 to receive the old Federal Building site free of all incumbrances, and will at the same time sell to the Federal Government the proposed site for a Federal Court building in the Civic Center for the sum of $2,450,000.

"In your communication you state that your department will give favorable consideration to the condemnation by the Federal Government of the Barclay, Vesey and West Broadway site under an agreement with the City of New York that the City shall bear that proportion of the cost of such site as will bear the same relation to the total cost as the area of the Federal property bears to the total area of its Vesey Street block, as the basis for an exchange of the Federal property in City Hall Park.

"This alternative is also agreeable to the members of the Board of Estimate and Apportionment, although it presents some technical difficulties which the other proposal avoids.

"The Board has asked me to inform you that it is considered important that a time be fixed in the agreement for the removal of the present Federal Building.

"The City officials stand ready to expedite the transfers in every way possible and upon advice from you the financial and legal details will be formally prepared and submitted.

"Very truly yours,

"[Signed] James J. Walker, Mayor."

[2] "My dear Mayor Walker:

"I have your letter dated June 6, 1930, advising acceptance by the City of New York of the Department's suggestions regarding the sale to the Government of a site in the civic center for the United States Courts and the basis for the disposition of the Federal property at Park Row and Broadway.

"The said basis is to be as follows: That the City of New York, in exchange for the Federal property in City Hall Park, shall agree to bear that proportion of the cost of acquiring the Vesey Street block as will bear the same relation to its total cost as the area of the Federal property bears to the total area of the Vesey Street block.

"The Department is prepared to recommend to Congress the amendment of existing legislation whereby the Secretary of the Treasury will be authorized to proceed with the acquisition by purchase, condemnation or otherwise of the block bounded by Barclay, Vesey, and Church Streets and West Broadway for a site for the accommodation of the post office and other Government offices, and for further authority to enable him to accept your offer for the sale to the United States of a site in the civic center of New York for a Federal court building for the sum of $2,450,000.

"It is considered that the simplest method of handling the proposition, so far as the so-called Vesey Street block is concerned, would be for the Government to proceed with the acquisition thereof in such manner as it finds to be to the best interests of the Government and to convey to the City of New York, upon payment to the United States of its proportion of the cost of the Vesey Street site, the Federal building and the site thereof at Park Row and Broadway.

"In order that there may be no misunderstanding regarding the area of the Federal property at Park Row and Broadway, you are advised that such

The Secretary said simply that he had received the mayor's letter "advising acceptance" of the proportionate sharing-of-cost plan and would prepare a recommendation for legislation authorizing the Federal Government to proceed on that basis. He also pointed out that the area of the old post office site was 65,259 square feet, and not 52,500, the area used in the original suggestion of the Merchants' Association. On June 24, the mayor announced to the press that an agreement had been reached between the city and the government, and released the Secretary's letter showing that the proportionate sharing-of-cost plan had been agreed upon.

No further communication appears until December 6, 1930, when the Secretary again wrote to the mayor. After repeating the substance of the June 12th letter, the Secretary went on to point out that the government had proceeded with the acquisition of the Vesey Street site. In furtherance of the "understanding" he suggested a "formal proposal" for the sale of the civic center site and enclosed forms used by the Treasury Department. In reply, the mayor acknowledged receipt of the letter and said he was forwarding the communication to the Law Department for study. This closed the negotiations.

During the course of negotiations legislative action was forthcoming. The Act of May 29, 1928, 45 Stat. 922, authorized the acquisition of a courthouse site at a cost of $2,000,000. This was raised to $4,000,000 by the Act of March 4, 1929, 45 Stat. 1623, 1660, which authorized the Secretary "in the alternative" to acquire the Vesey Street site. Then, by the Act of July 3, 1930, 46 Stat. 901, the Secretary was authorized to acquire the Vesey Street site at a cost of not more than $5,000,000, and a courthouse site for not more than $2,450,-000. Aside from these special acts there was a general authorization for the Secretary to acquire building sites. Act of May 25, 1926, 44 Stat. 630.

The city, for its part, sought and obtained a state law, Laws 1931, c. 39, authorizing the city to sell the civic center site to the government. This legislation was necessary, the city says, because the sale was to be private, and pre-existing authority allowed only public sales of municipal property. Accordingly, the statute specified the civic center site and authorized its sale directly to the United States. It further provided that the sale was to be on such conditions and terms as the sinking fund commissioners thought proper. Finally, it contained a paragraph stating that the land so transferred was to be used by the United States government for the construction and erection of a new federal courthouse, "in connection with an agreement between the city of New York and the United States government for the removal of the old federal building * * * and the acquisition of a new site * * * by the United States government for the construction and erection of a new postoffice building." As for the purchase of the old post office site, applicable provisions of the Greater New York Charter will be considered more fully below.

After passage of the state law the sinking fund commissioners proceeded to approve the sale. The commissioners[3] were, in effect, trustees of property securing capital obligations, and their approval was usually necessary before sales could be made. In June, 1931, the Acting Comptroller submitted a long report which outlined in detail the negotiations and the agreement and printed in full the letters of June 6th, 12th, and December 6th. Approval was forthcoming on July 1, 1931, in the form of a resolution reciting the terms of the general agreement and stating that the conveyance of the civic center should be conditioned on abandonment of the old post office site "pursuant to the provisions of the general agreement reached by the said parties."

Subsequently, the Corporation Counsel's office wrote to the Treasury suggesting that, since the sinking fund commissioners wished the sale to be conditioned on the general agreement, that agreement should

---

area as shown by the title papers on file in this Department is 65,259 square feet.

"It is suggested that you have a representative of the City visit this Department to take up the details of the matter on the basis above outlined.

"Very truly yours,
"[Signed] A. W. Mellon,
"Secretary of the Treasury."

[3] The commissioners were the mayor, the comptroller, the president of the Board of Aldermen, the city chamberlain, and the chairman of the Finance Committee of the Board of Aldermen. The first three were also members of the Board of Estimate.

be formally signed. Enclosed was a draft of a formal agreement, but it was returned unsigned because, as an Assistant Secretary wrote, it provided for a warranty deed, which the United States could not give, and for demolition of the old post office at government expense, for which no appropriation had been provided. No further correspondence ensued relative to this point.

After minor adjustments the civic center site was conveyed to the government by two deeds, the purchase money paid over, and construction begun on what is now the United States Courthouse in Foley Square. By 1934, the Vesey Street site had been fully acquired, partly by purchase and partly by condemnation, at a total cost of $5,056,246, and soon therafter erection of the post office at 90 Church Street was started. On January 20, 1936, Mayor La Guardia wrote to Secretary Morgenthau suggesting that the old post office be torn down before new government agencies attempted to move in. The Acting Secretary replied that the government would move out upon receipt of $4,354,733.07.[4] The mayor wrote back that he was "shocked, disappointed and unhappy" to hear that the government expected payment. This suit for specific performance followed.

The government contends that the terms of the agreement are definite and certain and were fully understood by both parties. Validity of the agreement is rested principally on § 442a of the Greater New York Charter, as added by Loc.Laws 1929, p. 80, as amended by Laws 1934, c. 2, § 2, which provided that the Comptroller, with the approval of the Board of Estimate and the separate approval of the mayor, could acquire sites for public parks and playgrounds by purchase or condemnation. Further, the government argues, the statute passed by the legislature ratified the agreement. And finally, if these arguments fail, the government asserts that the city is estopped to deny the validity of the agreement. The city controverts all these arguments of the government, and alleges in addition that the Secretary of the Treasury had no authority to enter into the agreement relied on, that if the New York statute ratifies the agreement it is unconstitutional, and that the agreement constituted an unconstitutional delegation of power to the government to determine the amount of the payment required. In the view I take of the case, it is unnecessary to pass on all of the various contentions put forth.

The first point is whether the negotiations and course of conduct previously set out constitute an enforceable contract. This raises several questions: (a) whether the parties, the mayor and the Secretary, intended to be bound; (b) whether the various writings are sufficiently definite and certain to constitute a contract; and (c) whether the writings constitute a memorandum sufficient to comply with the statute of frauds, Real Property Law, Consol. Laws, c. 50, § 259.

In considering first the intention of the parties, it is important to distinguish between the letters passing between the mayor and the Secretary as evidence of the agreement sufficient to satisfy the statute of frauds and the letters as definite offers, counteroffers, and acceptances. The course of dealing here involved is more complicated than the simple offer and unambiguous "I accept." Consequently no single bit of writing, except a formal contract, would be expected to contain formal words of contracting parties; and a formal document, as noted above, was never executed. Yet the possible loose ends found in any of the letters do not necessarily negative any meeting of the minds. If the entire picture presented demonstrates that at some point in time both sides were certain of what they agreed on, that is sufficient even though no one can point to a tangible bit of evidence pinning down the moment when minds met. To find a contract under these circumstances is less difficult than finding one by implication from inchoate contracting. See Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214; Moran v. Standard Oil Co. of New York, 211 N.Y. 187, 197, 105 N.E. 217.

If the complete picture is looked at, it is inconceivable that one would deny the existence of a solemn agreement between the United States and the City of New York. The mayor's letter of June 6, 1930, speaks of the city's "offer," and of the government's "alternative" being "agreeable" to the Board of Estimate; and the statement issued to the press on June 24 refers to the agreement in definite terms. The Secretary's reply of June 12 speaks of the city's "acceptance," and his letter of December 6 speaks of the "understanding."

---

4 There has evidently been an adjustment of a few dollars between this sum and the amount sued for.

And both the state law and the sinking fund commissioners' resolution refer to an agreement previously entered into. In sum, the record is replete with indications that the parties believed they had an agreement.

■ The next point is the degree of certainty in the agreement. The city points to ambiguities in the correspondence in June, 1930, such as the mayor's speaking of condemnation and the Secretary's speaking of acquisition by "purchase, condemnation or otherwise." Here again it is not necessary to find in the letters alone sufficient certainty for purposes of constructing a binding contract. The only important question is what ambiguity remained after the course of negotiations was complete. The answer to this is given by the formal agreement sent to the Treasury Department by the Corporation Counsel's office. It seems fair to assume from this document and its rejection that the only points at issue between the parties were what kind of deed the United States was to give and who was to bear the cost of demolition of the old post office. As for the deed, there had been no prior discussion of the point and it seems unlikely that any one worried much about it.[5] It would hardly do to deny the existence of an agreement because the parties had not settled whether the deed was to be quitclaim or warranty. Furthermore, both parties knew that whenever the government ceased to occupy the old post office the site reverted to the city; they would hardly stop to bicker over the type of deed.

The question of the cost of demolition is more important. Here, it must be admitted, there was a point of disagreement at all times. In his June 6th letter, the mayor spoke of the "old Federal Building site," whereas the Secretary in his June 12th letter spoke of conveying to New York the "Federal building and the site thereof." It might be argued that by silence the mayor accepted this counteroffer of the Secretary.[6] It seems better, however, to consider this a minor point—which it certainly was—that never became settled. It is of a

type with the details found immaterial in N. E. D. Holding Co. v. McKinley, 246 N.Y. 40, 157 N.E. 923. A court of equity would hardly refuse to enforce a major agreement such as this because one small item of expense was not definitely allocated.

The city does not rely on these points for their own importance, but as bits of evidence indicating that all the negotiation was preliminary. To back up its argument it relies on statements by both the mayor and the Secretary relative to getting together and working out the details. All this does is present certain inconclusive indicia of preliminary negotiation. Set against the picture of a long and drawn out attempt at final disposition of a controversy of almost a generation's duration, these indicia become of little significance. It is evident, moreover, that many details could not be worked out until after there was an agreement. For example, no date for evacuation could be even approximated until the government started acquiring the Vesey Street site. Yet no steps in that direction would be taken until the city agreed to share the cost. Such details as these do not defeat a contract. They can be left for future agreement, and if agreement fails a court can determine what is reasonable. N. E. D. Holding Co. v. McKinley, supra.

The city also makes a point of contrasting the informality of the alleged agreement with the formality of the transfer of the civic center site. The differences are easily explained. The latter was a conveyance of a specific piece of land, the former a comprehensive agreement covering a fairly large transaction. When the time came to vacate the old post office site, assuming this controversy had not arisen, undoubtedly a formal conveyance of that specific piece of land would likewise have been forthcoming. Until then, a less formal document would suffice. Even the formal agreement drawn up by the Corporation Counsel's office was less formidable than the document of conveyance relied on by the city. No doubt it would have been better

---

[5] It is true that the mayor's June 6th letter said that the old post office site was to be "free of all incumbrances." This can hardly have been considered vital, for the city must have known that the site had been encumbered since 1914 by an easement in perpetuity for a subway.

[6] An article in the New York Herald-Tribune for June 25, 1930, says that the city "waived argument as to who was to bear the cost of razing the present Federal building, agreeing to accept most of the cost." There is no indication of this in any correspondence, however, and the mere statement in a newspaper article is not enough to settle the point.

all around had a formal paper been signed. None was, and without any explanation of why the Corporation Counsel's office took no further steps after rejection of its draft, it is impossible to draw any inference from the lack of a formal writing.

■ The city also assails the agreement for failure to satisfy the statute of frauds, Real Property Law, § 259. The city's argument here is a little difficult, for the government has performed and seemingly could rely on the doctrine that equity will not under these circumstances allow the statute to become an engine of fraud. Walter v. Hoffman, 267 N.Y. 365, 196 N.E. 291, 101 A.L.R. 919; McKinley v. Hessen, 202 N.Y. 24, 95 N.E. 32. The city says, however, that since the government relies on the June 6th and 12th and the December 12th letters as constituting the memorandum of contract, the letters must comply with the statute. This apparently means that the government is worse off than if it had only an oral contract fully performed on its part. Be that as it may, the writings appear to conform to the interpretation of the statute as it obtains in New York. In De Goode v. Burton, 141 App.Div. 22, 125 N.Y. S. 662, 663, the court said that the essential requirement was that the whole contract must be stated in the memorandum with reasonable certainty, "so that the substance thereof may be made to appear from the record itself without recourse to parol evidence." See, also, Ward v. Hasbrouck, 169 N.Y. 407, 411, 62 N.E. 434, and authorities there cited.

■ From the preceding discussion of the definiteness of the contract, it is clear that sufficient facts are outlined in the letters to enable a court to know the terms without resort to parol evidence. Such ambiguities as existed were points necessarily left to be settled later, or went to the question, already answered, of whether there was any contract at all, and not to the possibility of variance between oral statements and the writing. Inasmuch as the government rests its case on these writings and uses other papers only for background, there is no occasion for worry whether telephone conversations, for example, would vary from the contents of the letters.

The city presses, however, the case of Poel v. Brunswick-Balke-Collender Co., 216 N.Y. 310, 110 N.E. 619, as showing a need for full statement in the memorandum. But that case was one of failure to accept, and references to the statute were to demonstrate that, if the writings affirmatively showed no acceptance, parol evidence could not be used to negative nonacceptance. Other cases relied on by the city are examples of memoranda omitting vital elements of the contract. No such omissions exist here.

To sum up this first point, the conclusion seems inescapable that competent officials of both the city and the government seriously entered into negotiations aimed at solution of a long-standing problem, reached a point of agreement, and settled the problem. It is equally clear that from the moment an agreement was reached these officials, especially the city's, spoke and acted as if they were certain that the issue was closed, and the problem solved. In fact, the bare recital of the most pertinent facts—to which a reasonable regard for brevity should limit this opinion—hardly conveys either the extent or the detail of the prior negotiations, or the complete sense of finality shown by the officials involved at the outcome. A court can hardly come along ten years after the event and deny the conclusiveness of the negotiations because of a small number of minor ambiguities or some bits of inconclusive language. To do so would allow close analysis and artificial emphasis to destroy the conclusions easily and fairly drawn from the whole story. That whole story is one of an enforceable contract; and unless some technical defense saves the city, the government is entitled to recovery.

If, then, this agreement is in its terms enforceable, the next question is whether the city is bound. This, the city concedes, is the keystone of its defense. It must be admitted at once that the activity of the city officials in approving the agreement was unorthodox. And because of this unorthodoxy, the city apparently assumes that the officials did not act. The government, on the other hand, takes the acts of the city officials, finds the section of the Greater New York Charter that most nearly comprehends such action, and asserts compliance. This approach seems justifiable, and by it the validity of the city officials' actions can be demonstrated.

As is frequently the case with municipal governments, the Greater New York Charter carefully hedged about the method of

purchase of real property.[7] The chief body whose action was required was the Board of Estimate and Apportionment. This board, composed of the mayor, the comptroller, the president of the Board of Aldermen, and the several borough presidents, had exclusive jurisdiction over expenditures, the incurring of debts, and the raising of money to meet these expenditures and obligations. It deliberated with great formality, usually in public meetings, with advance publication of its agenda. It also had a complete body of rules for action taken, some of which specifically related to the acquisition of property. Rule 24, for example, provided that proposed acquisitions should be studied and reported on by the city's chief engineer before the board acted. It is stipulated that the records of the board do not contain any reference to the purchase of the old post office site.

The government shows, however, that the board sometimes met in executive session, which was not public, not announced, and not necessarily reported in full in the minutes. Thus, it was possible for the board to act without any record of its action appearing. But this, the city argues, would be contrary to the elaborate rules of the board. The government answers that one of the rules provided that a three-fourths vote could suspend the rules. The whole controversy boils down to an assertion on one side that, since normal procedure was not followed, it must be concluded that no action was taken, and on the other, that such a conclusion is not inevitable so long as there was an alternative way in which action could have been taken.

■ Accepting the possibility of approval without a record of it, there remains the question whether there was approval. Here two points are made by the government. First, it is noted that in his June 6th letter the mayor said the members of the board had considered the matter in executive session and that the proportionate sharing-of-cost plan was "agreeable" to the members. Second, it is pointed out that in all the subsequent publicity and discussion no member of the board ever raised his voice to dispute the mayor's statements. If the board wished to act in camera, as it could legally, there was no better reporter of what had transpired than the mayor, who presided. The mayor's report of what had

happened, never questioned by any member, is satisfactory evidence of the board's approval.

■ The board's approval was not, however, the sole requirement for validity. Under § 442a of the Greater New York Charter, a provision for the acquisition of land for parks and playgrounds, which the government asserts is most nearly in line with the action taken, the mayor had to approve separately the authorization for acquisition, and the authorization ran to the comptroller, not to the mayor, who was the principal negotiator on the contract in suit. As for the mayor, it seems overly technical to argue that with all his activity and negotiation, he should have made the idle gesture of specifically saying, "I separately approve this." True, "approve" is used in that sense, and not in the sense of approbation. Nevertheless, if it is acceptable for the board to give its approval secretly, it is also acceptable for the mayor to represent that he approved the transaction without doing it formally. As for the comptroller, the fact that he did not initiate the deal and that he did not assert that he was making the acquisition is not crucial. The very magnitude of the transaction called for negotiation by the city's chief officer. And since there is no indication that the comptroller opposed the deal, it is hardly for the city now to claim that the contract was invalid because the mayor, rather than a lesser official, undertook negotiations. Moreover, the comptroller was present at the meeting of the board on June 6, 1930, at which time, according to the mayor, the deal was proposed; and subsequently the acting comptroller presented to the sinking fund commissioners the resolution for approval of the sale of the civic center site on condition that the general agreement for transfer of the old post office be adhered to.

All in all, the city's defense is technical and must rest on the harsh rule that one does business with a public agency at the peril of knowing all limitations of authority. As strong as this rule is, it is not unfair to leaven its hardness by presuming regularity and accepting unequivocal representations of compliance with the charter. Cf. State of Connecticut v. F. H. McGraw & Co., D.C.Conn., 41 F.Supp. 369, 374. It is this difference which makes in-

---

[7] The Greater New York Charter was superseded in 1938 by the New York City Charter. Though some important changes were made, the essential structure remains the same.

applicable such decisions relied on by the city as Scarborough Properties Corp. v. Village of Briarcliff Manor, 278 N.Y. 370, 16 N.E.2d 369, and Seif v. City of Long Beach, 286 N.Y. 382, 36 N.E.2d 630. In those cases it was admitted that correct procedure was not followed. Here that is the very question in issue. It was possible for the contract to be validly agreed to; all representations are that correct action was taken; the government establishes a case when it shows that much.

In deciding that the contract was validly entered into, it becomes unnecessary to determine whether or not the New York statute passed in 1931 ratified the city's action, or to decide the applicability of a doctrine of estoppel to assert invalidity. Nor is it necessary to go into the subsequent proceedings relative to sale of the civic center site. No one asserts that that transfer was invalid.

■ The city also argues that the Secretary of the Treasury had no authority to bind the government on June 12, 1930, when he stated that the government would proceed with the proportionate sharing-of-cost plan. In so far as this argument is used to show that the Secretary did not seriously intend to enter into a contract, it is to be noted that he had some authority to negotiate under the Act of May 25, 1926, supra, and that he could hardly get advance specific authority until he knew what he was likely to be able to get from the city. His letters also negative any conclusion that he was engaging only in preliminary negotiations; rather, it should be said that he was negotiating subject to ratification. As a defense per se, the city makes little argument. It hardly can, for the government has fully performed on its part, which certainly removes any opportunity to object. Moreover, there was complete ratification by Congress, which eliminates any possible previously existing lack of authority.

■ The final defense offered by the city is that the contract is unenforceable as an illegal delegation of power to the government, in that the latter had full power of acquisition of the Vesey Street site. To support its view it notes that one of the judges of this district observed in a condemnation hearing that he thought too much was being paid for some of the parcels at the Vesey Street site. Here again the city's argument must be characterized as extremely technical. The final cost, $5,056,246, was an insignificantly higher amount than the $5,000,000 estimated from the beginning. And since the government paid about 14 per cent of the total, it seems unlikely that exorbitant payments were made. The difficulty with the technical argument is that it prevents a contract of this kind ever being entered into. If the city's argument obtains, a contract whereby the city acquired the Vesey Street site and the government paid over the lesser portion would have been an invalid delegation by the United States. Thus, the most equitable method of working out this deal would have been impossible. When it is remembered that there was an estimate by which measure the actual cost and that the entire course of dealing implied that the government would exercise good faith in acquiring the parcels of land, it is evident that the degree of delegation was small and largely theoretical. Cf. McCutcheon v. Terminal Station Commission, 217 N.Y. 127, 148-152, 111 N.E. 661. Such delegation as this is not convincing enough to overthrow this contract by reliance on a rule designed to cover wholesale delegation of discretionary governmental power.

■ The United States asks for $4,354,907.60, plus interest from October 30, 1937, and tenders a conveyance of the old post office site. The city contests neither the accuracy of the stated figure nor its liability for interest, if an agreement is found. It cost the city $66,050.94 to demolish the old post office. Inasmuch as this was an item never agreed upon in the contract, it appears only equitable to allow the city to offset this against its liability. The United States is therefore entitled to a judgment enforcing the agreement accordingly.

This case has been most ably presented on both sides, with an assiduous attention to detail which unfortunately seems to have been wanting upon the part of the original negotiators herein. And one cannot be insensible to the difficulties one administration of a city may experience in having thrust upon it financial burdens incurred by a predecessor. There is undoubtedly a certain unreality in treating a city as a single continuing personality, notwithstanding the most complete change in its political leadership, and also in looking at two arms of government, each designed to operate for the public good, as only two warring litigants in a court of justice. But that is our law, and we must operate within its framework. Viewing the city as a juristic per-

son, it is inequitable to allow it to avoid legal responsibility for an arrangement so long in the making, so carefully brought to the point of final acceptance, and so thoroughly satisfactory to the parties at the time. If any redress for the financial burden thus entailed is to be had, it cannot come from the judicial branch of the government.

The clerk is therefore directed to enter judgment forthwith decreeing that the defendant shall pay the plaintiff the sum of $4,288,956.66, together with interest thereon from October 30, 1937, and the costs of this action, and that upon such payment the plaintiff shall deliver to the defendant, and the defendant shall accept, the surrender and conveyance of the site of the old post office building which the plaintiff has heretofore tendered.

